**NICHOLAS & TOMASEVIC, LLP**
Craig M. Nicholas (SBN 178444)
Alex Tomasevic (SBN 245598)
Shaun Markley (SBN 291785)
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org
Email: smarkley@nicholaslaw.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SIMON GORO, an individual; TONY RUSSELL, an individual; REY PENA, an individual; JOSE PENA, an individual; JEFF BELANDER, an individual; GUISEPPE ZIZZO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>FLOWERS FOODS, INC., a Georgia corporation; FLOWERS BAKING CO. OF CALIFORNIA, LLC, a California limited liability company; FLOWERS BAKING CO. OF HENDERSON, LLC, a Nevada limited liability company;<br><br>Defendants. | Case No. 17-cv-02580-JLS-JLB<br><br>**PLAINTIFF TONY RUSSELL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' FIRST AFFIRMATIVE DEFENSE**<br><br>**Date**:        January 31, 2019<br>**Time**:        1:30 p.m.<br>**Courtroom**:  4D (4th Floor Schwartz)<br><br>**District Judge**:   Janis L. Sammartino<br>**Magistrate Judge**:  Jill L. Burkardt<br><br>**Date of Removal**:  December 28, 2017 |

# **TABLE OF CONTENTS**

I.    **INTRODUCTION** .................................................................................... 1

II.   **STATEMENT OF THE CASE** ............................................................... 1

    A.   **Overview of Flowers' Business** ................................................... 1

    B.   **Flowers' Production and Distribution Structure** ........................ 2

    C.   **Flowers' Management Structure** ................................................ 2

    D.   **Flowers' Customers** ................................................................... 4

    E.   **Flowers Accounting and Financial Statements Further Reveal Distributors Merely Provide a Service Ancillary to Flowers' Business for a Fee and Under the Control of Flowers** ................................................................. 6

    F.   **Mr. Russell's Role within Flowers Direct-Store-Delivery Business** .................................................................... 8

    G.   **The Alternate Reality Depicted in Flowers' Distributor Agreement and Related Representations.** ............. 9

III.  **LEGAL STANDARD** ........................................................................... 12

IV.  **ARGUMENT** ........................................................................................ 13

    A.   **Under California's ABC test, Mr. Russell is an employee as a matter of law** ................................................... 13

        1.   *Prong (B): Mr. Russell performs work within Flowers' usual course of business* ............................. 13

        2.   *Separately, under Prong (A), Mr. Russell is not free from the actual and contractual right to control his work* ................................................... 16

    B.   *Dynamex* **Applies Retroactively to All Claims.** ............................ 17

        1.   Dynamex *Applies Retroactively* ...................................... 17

        2.   Dynamex *Applies to All Claims* ...................................... 18

    C.   **Even under the *Borello's* right to control test, the Court should grant Summary Judgment** ............................ 19

        1.   *Flowers retains all necessary control over Mr. Russell* ............................................................. 20

        2.   *Secondary Factors Support Ruling in Mr. Russell's Favor* ............................................................. 20

V.    **CONCLUSION** ..................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**

*Alexander v. FedEx Ground Package Sys., Inc.*,
765 F.3d 981 (9th Cir. 2014) ...................................................................13, 19

*Ayala v. Antelope Valley Newspapers, Inc.*,
59 Cal. 4th 522 (2014) ........................................................................................19

*Bowerman v. Field Asset Servs.*,
No. 3:13-cv-00057-WHO, 2017 F. Supp. 3d 910
(N.D. Cal. Mar. 17, 2017)....................................................................................19

*Dynamex Operations W. v. Super. Ct.*,
4 Cal. 5th 903 (2018) .....................................................................1, 13, 14, 18

*Estrada v. FedEx Ground Package Sys., Inc.*,
154 Cal. App. 4th 1 (2007) ...............................................................................20

*Evangelatos v. Super. Ct.*,
44 Cal. 3d 1188 (1988) .......................................................................................17

*Garcia v. Border Transportation Group, LLC*,
No. D072521, 2018 WL 5118546 (Cal. Ct. App. Oct. 22, 2018) ....................17

*Johnson v. VCG-IS, LLC*,
Case No. 30-2015-00802813-CU-CR-CXC
(Super. Ct. Cal. July 18, 2018) ....................................................................17, 18

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) ......................................................................12, 21

*Newman v. Emerson Radio Corp.*,
48 Cal. 3d 973 (1989) .........................................................................................17

*Ruiz v. Affinity Logistics Corp.*,
754 F.3d 1093 (9th Cir. 2014) ....................................................................13, 19

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
48 Cal. 3d 341 (1989) ............................................................................14, 19, 20

*Sierra Club v. San Joaquin Local Agency Formation Comm'n*,
21 Cal. 4th 489 (1999) ........................................................................................17

*U.S. v. Sec. Indus. Bank*,
459 U.S. 70 (1982)...............................................................................................17

*U.S. v. Tavizon-Ruiz*,
196 F. Supp. 3d 1076 (N.D. Cal. July 25, 2016) ............................................17

*Villalpando v. Exel Direct Inc.*,
2015 WL 5179486 (N.D. Cal. Sept. 3, 2015)..................................................13

**STATUTES**

U.C.C. § 2-106 (Am. Law Inst. & Unif. Law Comm'n) .......................................10

**REGULATIONS**

Wage Order No. 1-2001, Cal. Code Regs., tit. 8, § 11010 ....................................18

Wage Order No. 4-2001, Cal. Code Regs., tit. 8, § 11040 ....................................18

Wage Order No. 9-2001, Cal. Code Regs., tit. 8, § 11090.15 ...............................18

RUSSELL'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.   <u>INTRODUCTION</u>

The question here is: can Flowers meet its burden to justify its classification of its delivery driver or "distributor," Plaintiff Tony Russell, as an "Independent Contractor."  As explained below, Flowers cannot.

California law broadly protects workers like Mr. Russell, guaranteeing certain protections and minimum pay whenever (1) an individual works within the usual course of a hiring entity's business; *or* (2) the hiring entity retains control over the individual's performance. *Dynamex Operations W. v. Super. Ct.*, 4 Cal. 5th 903, 955 (2018), *reh'g denied* (June 20, 2018).  Mr. Russell and his fellow distributors are, undeniably, a crucial component of Flowers' multi-billion dollar direct-store-delivery, or "DSD," business.  They work directly within the "usual course of the hiring entity's business" (the selling and delivery of baked goods) and Flowers cannot meet its burden to prove otherwise.  Moreover, Flowers admits that it needs to and has secured the control necessary to direct Mr. Russell's performance of this important delivery-related work. For each of these independent reasons, Mr. Russell is entitled to partial summary judgment as to Defendants' First Affirmative Defense, which denies any employment relationship with Mr. Russell.

## II.   <u>STATEMENT OF THE CASE</u>

### A.   Overview of Flowers' Business

Flowers generates billions of dollars in revenue each year by marketing and selling bakery products[1] to large retail customers via its national direct-store-delivery ("DSD") business segment that. Flowers relies on, almost exclusively, a network of over 5,000 "independent contractor" distributors like Mr. Russell to complete the integral "delivery" aspect of the DSD business. *See* Ex. A (FLO Website and Investor Fact Sheet); Ex. B (Flowers Foods, Inc. 2018 Form 10-Q

---

[1] Flowers' bakery products include breads, buns, and snack cakes among other items marketed under well-known brand names like "Wonder Bread," "Tasty Cake," "Nature's Own," and "Dave's Killer Bread." Ex. A.

["2018 SEC Filing"]) at p. 8; Ex. Y (Rich Dep. Tr.) at 76:9-77:18; Ex. Z (Schoenewald Dep. Tr.) at 79-81. The DSD segment, of which the distributors are a large and crucial component, makes up 84% of Flowers' overall business.  Ex. Y (Rich Dep. Tr.) at 85:9-18; Ex. A (FLO Website and Investor Fact Sheet). Pursuant to Flowers' take-it-or-leave-it, non-negotiable Distributor Agreement ("DA") with distributors, Flowers classifies these individuals as "independent contractors." *See* Ex. Y (Rich Dep. Tr.) at pp. 160-161; Ex. L (Mr. Russell's DA).

### B.    Flowers' Production and Distribution Structure

To carry out this direct-store-delivery business, Flowers Foods, Inc. establishes wholly owned regional limited liability "bakeries" like Flowers Baking Co. of Henderson, LLC ("Flowers Henderson") and Flowers Baking Co. of California, LLC[2] ("Flowers California") (collectively these Defendants are called "Flowers") to bake its products and manage local delivery and sales activities for Flowers customers. *See* Ex. A (FLO Website and Investor Fact Sheet); Ex. Y (Rich Dep. Tr.) at p. 20. These bakeries deliver products down the line to the Flowers' more locally based warehouses. This is where Mr. Russell and other distributors pick up the products and deliver them to Flowers' retail customers within their assigned territories. *See* Ex. L (Mr. Russell's standard DA); Ex. Y (Rich Dep. Tr.) at pp. 30-31, 163.

### C.    Flowers' Management Structure

Each bakery, like Flowers Henderson, has a management team. At the top is the President, followed by a Vice President of Sales, a Director of Distributor Relations, various Directors of Sales, and finally Branch Sales Managers ("Sales Managers"). Ex. E (example of an organizational chart for Flowers California).[3]

---

[2] It is undisputed that until 2014 Flowers California was a state-wide bakery that is now divided into roughly Northern (Flowers Modesto) and Southern California (Flowers Henderson).

[3] Approximately one year ago, Flowers Henderson reorganized in ways not material to this litigation, for example shifting the "Branch Sales Manager" position under

1  Flowers designs these positions to manage and work alongside distributors just like
2  any employer would for employees.

3      For example, there is a Human Resources department for distributors.
4  Flowers, though, calls that department "Distributor Relations" or "Distributor
5  Enablement." Ex. Z (Schoenewald Dep. Tr.) at 16:15-17:21. That office does all of
6  the things a typical employer's HR department would do, such as be a "liaison with
7  distributors" helping to resolve disputes and other work-related issues. *Id.;* Ex. Z
8  (Schoenewald Dep. Tr.) at 34:13-35:10, 37:2-16, 40:5-25, 47:18-48:19. The HR or
9  "Distributor Relations" department also provides information about and helps
10  administer programs or fringe benefits, such as health insurance, life insurance,
11  vision coverage, and disability insurance for distributors. Ex. Z (Schoenewald Dep.
12  Tr.) at 43:24-46:19 (the administration of the company benefits includes automatic
13  deductions from distributor pay via the weekly settlement process).  Distributor
14  Relations also has the HR function of processing distributor terminations and final
15  pay. Ex. Z (Schoenewald Dep. Tr.) at 71:22-72:5, 74:2-15, 124:8-18.

16      Additionally, Flowers tasks its senior manager employees with growing its
17  customer base, assessing distributor compliance with customer guidelines, and
18  ensuring that Sales Managers are appropriately monitoring their assigned
19  distributors. Ex. C (Job Description for Director of Sales). In turn, the Sales
20  Managers directly oversee a group of distributors.  Ex. BB (Broker Dep. Tr.) at
21  129:18-130:24.  Those managers are responsible for training, monitoring, and
22  assisting distributors in the daily operation of the territories. Ex. D (Job Description
23  for Branch Sales Manager); Ex. BB (Broker Dep. Tr.) at 139:5-10:12, 159:13-160:5.
24  These managers also field, directly, complaints from stores about distributors and
25  then go coach the distributor and/or escalate the issues to upper management for
26  further handling and possible termination of these supposedly "independent"

27  _____
a new "Area Sales Director" title. The overview of this reorganization is available
28  at Ex. I.

distributors.  Ex. CC (Schatz Dep. Tr.) at 107:17-108:16; Ex. Z (Schoenewald Dep. Tr.) at 128:22-130:8 (discussing examples of Flowers issuing breach letters to distributors and possibly terminating distributors).  To keep an eye on distributors, Sales Managers can spend 30 hours in an average week going throughout the distributors' routes and checking up on them and their work.  Ex. BB (Broker Dep. Tr.) at 139:5-140:5; Ex. CC (Schatz Dep. Tr.) at 30:13- 31:16.

In addition to the above management structure, Flowers also uses its own employees or temporary employees to carry out the *same* function as distributors operating under a DA. For example, where a territory is vacant, Flowers uses a Territory Operations Specialist to carry out this same delivery function. *See* Ex. F (describing a Flowers' Territory Operations Specialist position that operates open distributor territories); Ex. Y (Rich Dep. Tr.) at pp. 100-104 (explaining Flowers may use its own employees or contract with a temp agency to obtain employees to operate territories in place of a distributor operating under a DA); Ex. BB (Broker Dep. Tr.) at 29:11-23, 30-5-13.  There is really no significant difference between the day-to-day duties and work of an employee driver and that of the "distributors," like Mr. Russell, that Flowers claims are independent contractors.  Ex. BB (Broker Dep. Tr.) at 37:11-23, 41:17-44:21.

### D.    Flowers' Customers

Flowers contracts with large retail and fast food customers to sell bakery products. These customers include Walmart and Sonic. *See, e.g.,* Ex. K (Flowers' contract with the fast food chain Sonic); Ex. H (Flowers' contract with Walmart); *see* Ex. DD (Russell Dep. Tr.) at pp. 93 (confirming he services a Sonic), 240 (confirming he services a Walmart location). Walmart is Flowers' largest customer. Ex. B (2018 SEC Filing) at p. 8.

Under these contracts, Flowers commits to delivering fresh, marketable bakery products on terms requested by the customers. *See generally* Ex. K, Ex. H. Flowers also agrees that it has unencumbered title and the right to sell the bakery

products to its customers and that it will bear risk of loss and maintain title to products at least until the customer takes possession. *See* Ex. K at §§ 5, 9; Ex. H at § 13(k). The contract terms prevent Flowers from assigning or delegating its rights and obligations without approval from the customer. *See* Ex. K at § 13; Ex. H at § 20. Flowers has produced no documents in this case suggesting that it has delegated any rights under these contracts. Markley Decl. ¶¶ 9, 11.

Within the "highly competitive fresh bakery market," Flowers recognizes the heavy risks of losing these customers or failing to grow and reach new customers. Ex. B (2018 SEC Filing) at pp. 1, 41. Understandably, as part of its contracts with customers like Walmart, Flowers agrees to abide by the standards and requirements prescribed by the customer as a condition of the contract. *See, e.g.,* Ex. H at § 22. In turn, Flowers emphasizes to and requires that both its sales and management employees, as well as its distributors like Mr. Russell, meet applicable customer service requirements. *See* Ex. C and D; Ex. L at §§ 2.6, 5.1 (requiring compliance with retail customer requirements); Ex. Y (Rich Dep. Tr.) at pp. 142-144 (confirming the DA requires distributors like Mr. Russell to follow customer requirements and policies).

Customer requirements that Flowers accepts and imposes on distributors (as part of "good industry practices") are quite onerous. *See* Exs. G, P, Q, R. For example, Flowers' DA forces Mr. Russell to abide by the following requirements: service hours and service days, strict dress codes, electronic device restrictions, customer service standards, product placement protocols, product handling and storage protocols, inventory and back-stock standards, store communication and check-in procedures. *Id.* Failure to comply can mean termination by Flowers or the customer (which would, in all likelihood, lead to termination by Flowers). *See* Ex. L at § 17, *et seq*.; Ex. G at § 3. Flowers customers also reserve the right to change these requirements and enact new or additional standards that Flowers will impose

upon distributors like Mr. Russell through the DA. *See* Ex. L at §§ 2.6, 5.1; Ex. H at § 22.

Flowers can and does deem distributors in material breach of the DA for failing to comply with customer requirements. *See* Ex. L at § 17, *et seq*.; Exs. T, U, and V.

### E. Flowers Accounting and Financial Statements[4] Further Reveal Distributors Merely Provide a Service Ancillary to Flowers' Business for a Fee and Under the Control of Flowers

In Flowers' own words, the " ███████████████████████████████████ ███████████████████████████ " and, in fact, Mr. Russell's " ██████████ ███████████████████████ " Ex. M at p. 4.

The revenue that Flowers recognizes and publicly touts reflects gross sales that it makes to its customers, like Walmart, (and not "sales" that it makes to distributors). Ex. EE (Davis Dep. Tr.) at pp. 38-41 (explaining, as the principal, Flowers recognizes revenue on total sales to its customers not on the lesser amount distributors "pay" Flowers); *see* Ex. A. This contrasts with distributors who earn "a percentage of [Flowers'] wholesale price of product sold to . . . customers" as a "distributor fee." *See* Ex. FF (Flowers' SEC Form 10-K for fiscal year ended January 1, 2011 ["2011 SEC Filing"]) at p. F-7[5]; Ex. O at p. 7 (" ████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████ "); Ex. AA (Schoenewald, Corporate Designee, Dep. Tr.) at 82:15-83:25, 87:16-20, 104:17-20.

It is Flowers' responsibility to carry out the performance obligation owed to customers and, in so doing, Flowers maintains title and risk of loss over bakery

---

[4] Flowers financial statements are intended to accurately and truthfully disclose information such as financial condition and business practices and to provide investors with information on which to make investing decisions. Ex. EE (Davis Dep. Tr.) at pp. 11-16.

[5] Even though this filing pre-dates Mr. Russell's relationship with Flowers, Flowers admits that its revenue recognition has not changed over the years. Ex. EE (Davis Dep. Tr.) at pp. 110-11.

1   products until it satisfies those performance obligations. This is true even though

2   distributors carry out some aspects of Flowers' promised performance like delivery

3   of the products to customer locations. *See* Ex. N at p. 7 (explaining that although

4   Flowers assigns certain functions to the distributors, " ████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████ ");

7   Ex. O at p. 7 (" █████████████████████████████████████

8   ████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████ ");

10  Ex. O at p. 9 (" █████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████ "); Ex. B (2018 SEC Filing) at 9 (stating Flowers maintains

15  inventory risk and "fulfills the contractual obligations for [retail] sales."); 2011 SEC

16  at p. F-7 (title and risk of loss pass from Flowers only when the customer, not the

17  distributor, takes possession).

18      Flowers recently assessed this relationship and concluded that it "is the

19  principal, the [distributor] is the agent, and the [retail customer] is the customer."

20  Ex. B (2018 SEC Filing) at p. 9. This conclusion confirms that Flowers controls the

21  products and the distributor merely assists Flowers in getting the product to the

22  market. Ex. EE (Davis Dep. Tr.) at pp. 18-19, 35-37. Notably, prevailing accounting

23  standards dictate that in order for Flowers to claim that it is the principal and the

24  distributor is the "agent" in the arrangement, Flowers must be the one that has control

25  over the "right to a service to be performed by [the distributor], which gives

26  [Flowers] the ability to direct [the distributor] to provide the [distribution] service to

27  [retail] customer. . . ." *See* Financial Accounting Standards Board (May 2014),

28  Revenue from Contracts with Customers (Topic 606), No. 2014-09, available at:

https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176164076069 &acceptedDisclaimer=true. As it must, Flowers follows these standards in making accounting decisions and related financial and accounting conclusions. Ex. EE (Davis Dep. Tr.) at pp. 55-59.

Additionally, if a retail customer fails to pay under the contract, it is Flowers and not the distributor that holds the risk of non-payment. Ex. EE (Davis Dep. Tr.) at pp. 72-74; Ex. P at FBCofH 1580 (Flowers representing to the SEC that it '████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ").

### F.   Mr. Russell's Role within Flowers Direct-Store-Delivery Business

Mr. Russell works long hours seven days per week to fulfill his obligations under the DA.  To ensure adequate fresh product within his assigned territory, he orders for and delivers products to all his assigned customers five days per week (as Flowers requires) and then visits many customer locations the other two days of the week to ensure adequate stocking levels on customers' shelves. In addition to actual delivery of the bakery products, Mr. Russell, like all distributors, is "responsible for ordering products [based on Flowers' projected and closely monitored projections], stocking shelves, maintaining special displays, and visiting customers *daily* to ensure adequate inventory and removing unsold goods." Ex. GG (Flowers' Form 10-K for the fiscal year ending December 28, 2013 ["2014 SEC Filing"]) at p. 7; *see* Ex. S (Russell Decl.); Ex. DD (Russell Dep. Tr.) at pp. 191-193.

Failure to comply with the daily service requirements is prohibited and strictly enforced. Ex. L at §§ 2.6, 5.1, 14. Where a distributor does not service the route for a day Flowers will notify the distributor they are in breach of the DA and threaten termination. Exs. W and X.

[*rest of page intentionally left blank*]

RUSSELL'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

### G.    The Alternate Reality Depicted in Flowers' Distributor Agreement and Related Representations.

In early 2013, Flowers presented Mr. Russell with its standard, take-it-or-leave-it DA that he signed in his individual capacity.[6] *See* Ex. L; Ex. Y (Rich Dep. Tr.) at pp. 160-161. The DA describes Flowers as a successful manufacturer and marketer of bakery products that divides some of its customer market into distribution territories that it sells to "Independent Distributors." Ex. L at p. 1. Under the DA, Flowers sets the terms and price of products that it will sell to the distributor, who will take title and risk of loss upon transfer of the products at Flowers' warehouse. *Id.* at § 4.1. Flowers also sets the retail sales price in the vast majority of instances and in so doing controls the "margin" that distributors earn (the retail sales price less the price charge to distributor for product). *See* Ex. Y (Rich Dep. Tr.) at 225-236; Ex. AA (Schoenewald, Corporate Designee, Dep. Tr.) at 82:15-83:25, 87:16-20, 104:17-20. Flowers also sets the amount of stale products that it will repurchase from the distributor. Ex. L at § 12.2. By controlling the margin and the amount of stale product to repurchase, Flowers effectively controls Mr. Russell's earnings.

After the distributor takes title of bakery products, however, Flowers retains a security interest over all products in the distributor's possession. *Id.* at § 8.6.

The distributor agrees to abide by good industry practices and to use commercially reasonable best efforts. Ex. L at §§ 2.6 and 5.1. This means properly rotating products, promptly removing stale products, maintaining proper service and delivery to retail outlets per the retail outlet's specifications with one's territory, and

---

[6] Flowers requires distributors to incorporate and ultimately Mr. Russell did so, but this difference is immaterial in light of the personal guarantee attached to every DA requiring the distributor to personally guarantee performance required under the DA. *See* Ex. L at p. 25 (Personal Guarantee). Flowers' incorporation requirement provides it with the appearance of a business-to-business relationship while still securing and guaranteeing performance by an individual employee.

maintaining Flowers' specified equipment in good condition—as well as cooperating in Flowers' sales/marketing efforts for the products, presenting a clean appearance (for the Distributor Employee and his or her vehicle), not carrying competing merchandise, and maintaining proper liability insurance. *Id.*

Non-compliance with the above is a material breach that can result in termination. *Id.* at §§ 5.2, 17. Additionally, where the distributor fails to operate the territory up to Flowers' standards, Flowers can and will operate the territory itself and charge the distributor for this service. *Id.* at § 14, *et seq.*; *see* Ex. X. The distributor also agrees to maintain a clean and professional vehicle to provide services under the DA. Ex. L at § 9.1.

As it relates to chain (*i.e.*, large retail or fast food) accounts, Flowers agrees to be the distributor's agent for the limited purpose of obtaining authorization for the distributor to sell products to these accounts. *Id.* at § 6.1. Similarly, Flowers agrees to accept payment for goods sold by distributors to certain customer accounts and credit the distributors for these sales; however, Flowers' obligation to credit the distributor only extends to actual payment received from the customer. *Id* at §§ 8.3, 8.4. In other words, the risk of nonpayment for these accounts rests with the distributor.

In summary, and to show the contrast between the carefully-crafted DA and reality, the following is helpful:

| | Distributor Agreement | Retail Contracts | Accounting and Financial Statements |
|---|---|---|---|
| **Performance obligation for delivery** | Distributor buys product and resells[7] to customers. Distributor is responsible for proper service of | Flowers promises performance and may not assign away its rights and obligations.<br><br>Ex. K; Ex. H | Flowers fulfills contractual obligations for retail customers consistent with retail customer expectations. |

---

[7] A "sale" consists of passing of title from the seller to the buyer. *See* U.C.C. § 2-106 (Am. Law Inst. & Unif. Law Comm'n).

| | Distributor Agreement | Retail Contracts | Accounting and Financial Statements |
|---|---|---|---|
| | customers in the territory at all times and must carry this out according to good industry practices, including abiding by customer guidelines. Flowers' contends that under the DA, retailers like Walmart are distributors' customers.<br><br>Ex. L at §§ 2.6, 4.1, 5.1, 14, *et seq.*; Ex. Y (Rich Dep. Tr.) at pp. 49-55. | | Ex. N at p. 7; Ex. O at pp. 7, 9; Ex. B (2018 SEC Filing) at p. 9; Ex. FF (2011 SEC Filing) at p. F-7. |
| **Principal-agent** | As it relates to chain (*i.e.*, large retail or fast food) accounts, the DA says the distributor is the principal and Flowers is the agent for the limited purpose of obtaining authorization for the distributor to sell products to these chain accounts.<br><br>Ex. L at § 6.1. | [not addressed, although, as noted below, Flowers takes responsibility for the performance obligation] | Flowers concludes that it "is the principal, the [distributor] is the agent, and the [retailer] is the customer." This means Flowers controls the products and the distributor merely assists Flowers in getting the product to the market.<br><br>Ex. B (2018 SEC Filing) at p. 9; Ex. EE (Davis Dep. Tr.) at pp. 18-19, 35-37. |
| **Title and risk of loss upon delivery to retail customer** | Title and risk of loss pass to the distributor after he picks up products from the warehouse.<br><br>Ex. L at § 4.1 | Flowers states that it has title to products and bears risk of loss until the time of delivery to the customer at which point title and risk of loss passes to the customer. | Flowers maintains title and risk of loss over bakery products until it satisfies obligations to customers.<br><br>Ex. B (2018 SEC Filing) at p. 9; Ex. FF |

RUSSELL'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

|  | Distributor Agreement | Retail Contracts | Accounting and Financial Statements |
|---|---|---|---|
|  |  | Flowers may not assign or delegate its rights and obligations.  Ex. K at §§ 5, 9, 13; Ex. H at §§ 13(k), 20. | (2011 SEC Filing) at p. F-7. |
| **Risk for non-payment** | The risk of nonpayment for retail accounts rests with the distributor.  Ex. L at §§ 8.3, 8.4. | [not addressed] | Flowers and not the distributor holds the risk of non-payment by retail customers. Ex. EE (Davis Dep. Tr.) at pp. 72-74; Ex. P at FBCofH 1580. |
| **Security interest in products upon delivery to customer** | After the distributor takes title of bakery products at the warehouse, Flowers retains a security interest over all products in the distributor's possession.  Ex. L at § 8.6. | Flowers states it has unencumbered title and the right to sell bakery products to its customer.  Ex. K at §§ 5, 9; Ex. H at § 13(k). | [not addressed] |

## III.   LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Here, the Court should grant partial summary judgment on Flowers' First Affirmative defense. Construing the facts in the light most favorable to Flowers, it cannot meet its burden to establish that Mr. Russell is an independent contractor. *Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (burden is on the employer to "prove, if it can, that the presumed employee was an independent contractor"). The Ninth Circuit has consistently found employment

status as a matter of law where, as here, the working relationship is controlled by a form contract. *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (FedEx drivers were employees as a matter of law on summary judgment under California's right-to control test); *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1102 (9th Cir. 2014) (reversing trial court's ruling in favor of defendant after bench trial and finding plaintiffs were employees as a matter of law under California's common law right-to-control test); *see also Villalpando v. Exel Direct Inc.*, 2015 WL 5179486 at *51 (N.D. Cal. Sept. 3, 2015) (same). Under the new standard handed down in *Dynamex*, *infra*, this same result should attach even more readily.

## IV.   ARGUMENT

### A.   Under California's ABC test, Mr. Russell is an Employee as a Matter of Law

*Dynamex* puts the burden on Flowers to prove each of these three things to justify its "independent contractor" classification:  "(A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." *See Dynamex Operations W. v. Super. Ct.*, 4 Cal. 5th 903, 957 (2018), *reh'g denied* (June 20, 2018). Flowers cannot meet its burdens on either of the first two prongs, so we need not even examine the third.

#### 1.   *Prong (B): Mr. Russell performs work within Flowers' usual course of business*

We start first with the middle prong.  Flowers' decision to pass most of its sale, delivery, and merchandising-related aspects of its business operations and

1  customer performance obligations to Mr. Russell creates an employment
2  relationship. For this reason alone, Plaintiff's motion should be granted.

3      *Dynamex's* prong (B) "bring[s] within the employee category *all* individuals
4  who can reasonably be viewed as working *in the hiring entity's business*." *Dynamex*,
5  4 Cal. 5th at 959 (emphasis in original; internal quotations omitted). This prong
6  reiterates California's long-standing rule that a business may not avoid employee
7  status by "carving up its production process into minute steps, then asserting it lacks
8  'control' over the exact means by which one such step is performed by the
9  responsible workers." *Id.* at 933 (*citing S.G. Borello & Sons, Inc. v. Dep't of Indus.*
10  *Relations*, 48 Cal. 3d 341, 357 (1989).) In explaining the broad scope of this prong,
11  the California Supreme Court compared a properly classified and truly independent
12  contractor like a plumber or electrician engaged by a company to perform a specific
13  task, with a *mis*-classified "independent contractor" like the at-home seamstress
14  making clothes designed and sold by a clothing manufacturer and a cake decorator
15  working regularly for a bakery to custom design its cakes. *Dynamex*, 4 Cal. 5th at
16  959-60.

17      Here, it is undisputed that Flowers "produces and markets bakery products,"
18  selling them to its retail and foodservice customers. *See* Ex. A. It does so in two
19  segments:  Warehouse Delivery and, as relevant here, Direct-Store-Delivery (or
20  "DSD"). *Id.* In turn, Flowers' direct-store-delivery business depends on Mr.
21  Russell's delivery and merchandising-related services.

22      More specifically, Flowers bakes and markets the bread. Flowers then agrees
23  to sell and deliver the bread to its customers, like Walmart, and put it on their shelves,
24  pursuant to the customer requirements and specifications that Flowers and the
25  customer agree on before-hand in their contracts, taking payment from directly from
26  Walmart.  *See* Exs. H, K. But Flowers sub-contracts these last parts (delivery to
27  Walmart, stocking Walmart's shelf, merchandising, and ensuring satisfaction of the
28  contract between Flowers and Walmart) via "Distributor Agreements" with Mr.

Russell and other distributors who carry out these tasks under the supervision of Flowers management. *See* Section II, *supra*, and specifically Ex. N at p. 7 ("█████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████"). Stated simply, the 5,000+ distributors like Mr. Russell are the "delivery" part (and more) of the Flowers direct-store-delivery segment, which comprises 84% of Flowers' overall revenue.[8] Ex. A.

Flowers' own documents remove any doubt about this relationship. Flowers admits that distributors' "████████████████████████████████████████████ ███████████████" (Ex. M at p. 4); concluding distributors' "██████████████ ███████████████████" (*id.* at p. 4); and "████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████" (Ex. N at p. 7). Flowers' contracts with retailers like Walmart have what Flowers calls "██████████████████," but Flowers engages the distributors "████████████ ████████████████████████████████████" Ex. EE (Davis Dep. Tr.) at 34:19-36:2.

Finally, the fact that Flowers uses its own *employees* and temporary employees from other companies to carry out the *same* job further proves that this job is part of Flowers' usual course of business, and that the "independent contractor" label is one borne of legal convenience, not reality. Ex. F (describing a Flowers' Territory Operations Specialist position that operates open distributor territories); Ex. Y (Rich Dep. Tr.) at pp. 100-104 (explaining Flowers may use its own employees or contract with a temporary agency to obtain employees to operate territories in place of a distributor operating under a DA); Ex. BB (Broker Dep. Tr.)

---

[8] In addition, it would be curious for Flowers to argue that the 5,000 distributors are not an important part of the Flowers business when it has an entire department at its headquarters—Distributor Relations or Distributor Enablement—devoted to acting as a liaison between the distributors and Flowers, and when it has an army of area sales "managers" on payroll whose only personnel they "manage" are the distributors. *See* Exs. A, D; Ex. Y (Rich Dep. Tr.) at pp. 8, 66-74.

at 37:11-23, 41:17-44:21. (There is really no significant difference between the day to-day duties and work of an employee driver and that of the "distributors," like Mr. Russell, that Flowers claims are independent contractors).

Flowers cannot prove that Mr. Russell's work is "outside the usual course" of Flowers' business. Summary judgment on Flowers' affirmative defense is, thus, proper.

2.    *Separately, under Prong (A), Mr. Russell is not free from the actual and contractual right to control his work*

Flowers cannot disprove that it reserves broad rights to control Mr. Russell under the DA and that it, in fact, exercises vast control over his work. Flowers designs its regional management team to ensure distributors are meeting customer needs and carrying out their duties under the DA. *See* Section II(C), *supra*. To avoid this prong, Flowers will have to argue that its management team, like Sales Managers, have no power to and do not manage anything at all. But this is simply not the case as managers are responsible for disciplining, training, monitoring, and assisting distributors in the daily operation of the territories. Ex. D (Job Description for Branch Sales Manager); Ex. BB (Broker Dep. Tr.) at 139:5-10:12, 159:13-160:5.

Additionally, under the DA—executed by Mr. Russell in his personal capacity and personally guaranteed by him (*see* Ex. L)—Flowers requires constant, daily service of the territory in line with its good industry practices, a term that encompasses rigid and exacting retail requirements. *See* Ex. L at §§ 2.6, 5.1, 14; Exs. G, P, Q, R. Flowers needs to be able to meet changing customer requirements and to pass those requirements on to its distributors. It accomplishes this by *contractually requiring* distributors to meet customer standards. *Id.* Where a distributor operating under a DA fails to comply with these contractually required standards, Flowers demands compliance and threatens termination. *See* Ex. L at § 17; Exs. T, U, V, W, X.

1    Given the extent of Flowers' actual and contractual right to control Mr.

2    Russell, the Court should grant his motion.

3        **B.**    ***Dynamex* Applies Retroactively to All Claims.**

4        Defendants will probably argue that the *Dynamex* decision does not apply

5    retroactively and/or that it does not apply to Plaintiffs' claims for expense

6    reimbursement under California Labor Code Section 2802.  Defendants would be

7    wrong.

8                    *1.*    Dynamex *Applies Retroactively*[9]

9        There should be no question that *Dynamex*—a unanimous decision of the

10   California Supreme Court—applies here retroactively. As the California Supreme

11   Court has explained, "[t]he general rule that judicial decisions are given retroactive

12   effect is basic in our legal tradition." *Newman v. Emerson Radio Corp.*, 48 Cal. 3d

13   973, 978 (1989); *see also Sierra Club v. San Joaquin Local Agency Formation*

14   *Comm'n*, 21 Cal. 4th 489, 509 (1999).[10]  Indeed, the first courts to apply *Dynamex*

15   have agreed that it applies retroactively. *See Garcia v. Border Transportation*

16   *Group, LLC*, No. D072521, 2018 WL 5118546, *11 (Cal. Ct. App. Oct. 22, 2018)

17   (applying *Dynamex* retroactively to Labor Code claims that are covered by the Wage

18   Orders); *Johnson v. VCG-IS, LLC*, Case No. 30-2015-00802813-CU-CR-CXC,

19   Ruling on Mot. in Lim. (Super. Ct. Cal. July 18, 2018) (attached as Ex. HH).

20       Importantly, the California Supreme Court rejected Dynamex's motion to

21   modify the ruling so that it would apply prospectively only. *Dynamex*, 4 Cal. 5th

22   ────────────────

23   [9] Of course, because Defendants still use the same "independent contractor" model
     today—*e.g.*, Plaintiff is still operating under the exact same written Distributor

24   Agreement—any "retroactivity" argument by Flowers would be useless as of at
     least the date of the *Dynamex* opinion and through today.

25   [10] The Court has gone so far as to say that "[t]he principle that statutes operate only
     prospectively, while judicial decisions operate retrospectively, is familiar to

26   every law student." *Evangelatos v. Super. Ct.*, 44 Cal. 3d 1188, 1207 (1988)
     (*citing U.S. v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982)); *U.S. v. Tavizon-Ruiz*,

27   196 F. Supp. 3d 1076, 1078 (N.D. Cal. July 25, 2016) ("[D]ecisions of statutory
     interpretation are fully retroactive because they do not change the law, but rather

28   explain what the law has always meant.").

─────────────────────────────────

903, *reh'g denied* (June 20, 2018). The decision thus applies to the events underlying the long-pending *Dynamex* case itself, going years into the past and thus applies to pre-*Dynamex* events in other cases as well.

### 2. Dynamex *Applies to All Claims*

Defendants may also argue that *Dynamex* does not apply to Plaintiff's claims for expense reimbursement under California Labor Code Section 2802 or for unlawful expense deductions.[11] However, the ABC test announced in *Dynamex* applies to those claims because the Court held that it applies to Labor Code claims covered by the California Wage Orders. *See Dynamex*, 4 Cal. 5th at 956-57. Indeed, all of the possibly applicable Wage Orders require that an employer provide its employees with any "tools or equipment" that "are necessary to the performance of a job" (with certain exceptions not applicable here). *See, e.g.,* Wage Order No. 1-2001, ¶ 9(B), Cal. Code Regs., tit. 8, § 11010 (Regulating the "Manufacturing Industry"); Wage Order No. 4-2001, ¶ 9(B), Cal. Code Regs., tit. 8, § 11040 (Regulating the "Professional, Technical, Clerical, Mechanical, and Similar Occupations"); Wage Order No. 9-2001, ¶ 9(B), Cal. Code Regs., tit. 8, § 11090.15 (regulating the "Transportation Industry").

This Wage Order requirement—to supply the tools and equipment free of charge—mirrors that of California Labor Code Section 2802, which is to reimburse employees for all of their necessary business expenses. Indeed, one California court has already concluded that the *Dynamex* ABC test applies to PAGA claims predicated on violations of the Labor Code that are covered by the Wage Orders, *including* claims for expense reimbursement under Section 2802. *See Johnson*, Case No. 30-2015-00802813-CU-CR-CXC, Ruling on Mot. in Lim., *5 (recognizing that a claim for expense reimbursement under Section 2802 is "rooted in the wage

---

[11] As to whether *Dynamex* applies to expense reimbursement claims, the *Dynamex* Court expressly declined to address that question because the issue was never briefed by the parties. *See Dynamex*, 4 Cal. 5th at 916, n. 5.

orders"); Ex. HH at p. 6. *Dynamex* should apply to all claims for all relevant time periods.

### C. Even under the *Borello's* right to control test, the Court should grant Summary Judgment

If for whatever reason the Court finds *Dynamex* does not apply to all Mr. Russell's claims, Plaintiff is still entitled to partial summary judgment under the older common law *Borello* test for employee status. *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).

This test looks at "the right to control the manner and means of accomplishing the result desired." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (*citing Borello*, 48 Cal.3d at 350.) The test focuses on "not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014) (emphasis in original). In *Ayala*, the California Supreme Court refused to allow some freedom, inherent to a degree in all employment, to erase an employer-employee relationship where the "employer has general supervision and control over [the worker]." *Id.* at 532. In the same vein, a "defendant's right to control need not extend to every possible aspect of the plaintiff's work." *Bowerman v. Field Asset Servs.*, No. 3:13-cv-00057-WHO, 2017 F. Supp. 3d 910, 929 (N.D. Cal. Mar. 17, 2017). Rather, "[t]he relevant question is whether the defendant retains 'all necessary control' over the plaintiff's performance of his job duties." *Id.* (*citing Borello*, 48 Cal. 3d at 357); *Ruiz*, 754 F.3d at 904; *Alexander v. FedEx Ground Package Sys.*, 765 F.3d at 992 (9th Cir. 2014) (recognizing and adopting California courts' "all necessary control" analysis).

*Borello* also considers several less important secondary factors relevant in determining if an employment relationship exists. *Ruiz*, 754 F.3d at 1100. Courts weigh these factors as a whole and need not find in a plaintiff's favor on each factor to rule favorably at the summary judgment stage. *Alexander*, 765 F.3d at 992.

### 1.     *Flowers retains all necessary control over Mr. Russell*

Flowers secures retail customer business from companies like Walmart by promising certain performance obligations and agreeing to abide by rigid delivery requirements. *See* § II(D) *supra* and *see e.g.* Ex. H. After making these promises and being bound to carry out these obligation, Flowers attempts to walk an invisible line where it outsources certain delivery responsibilities to "independent contractors" while also retaining the necessary control to ensure performance. *See* §§ II(F) and (G), *supra*. This strain is evident in the DA that, on the one hand requires the distributor to follow "good industry practices" including following customer requirements (Ex. L at §§ 2.6, 5.1) and to provide proper service to the territory (*id.* at § 14), but on the other formulaically recites that Flowers does not control the distributor (*id.* at § 16.1). In the end, Flowers' DA as well as Flowers' own admissions regarding its control establish that it has the right to control and direct Mr. Russell's delivery of Flowers' products to Flowers' customers and lay bare Flowers' efforts to create the appearance of any true distributor independence. Ex. L at §§ 2.6, 5.1, and 14; Ex. EE (Davis Dep. Tr.) at pp. 18-19, 5-37.

California's Second District Court of Appeals endorsed a trial court ruling finding an analogous independent contractor agreement to be nothing more than a "brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model." *See Estrada v. FedEx Ground Package Sys., Inc*., 154 Cal. App. 4th 1, 9 (2007). Likewise, this Court can safely ignore Flowers' boilerplate disclaimer of control in light of the reality of Flowers' business, its need to control distributors, and its admission that it in fact does control distributors.

### 2.     *Secondary Factors Support Ruling in Mr. Russell's Favor*

Many secondary factors also tip in Mr. Russell's favor such that summary judgment is appropriate (*Borello*, 48 Cal.3d at 351, lists these factors, among others):

- Mr. Russell's work is part of Flowers' business (as detailed above). In fact, Flowers' own employees carry out the same work, and Flowers has an entire management team above him to direct his work. In short, this is not the type of work carried out without supervision.
- The tasks Mr. Russell carries out do not require a high degree of skill or training.
- Flowers provides the place of work (*i.e.*, its warehouse) and obtains the customers where Mr. Russell delivers product.
- Mr. Russell has worked for Flowers since early 2013 and his DA has no end date. *See* Ex. L.
- Flowers retains various termination options, including termination on 24 hours' notice for substantially harming Flowers' business or becoming unable to service a customer account, among other things. *Id.* at § 17, *et seq*.
- Flowers paid Mr. Russell a percentage of sale price the Flowers customers, like Walmart, paid for the goods. Ex. AA (Schoenewald, Corporate Designee, Dep. Tr.) at 82:15-83:25, 87:16-20, 104:17-20; *cf. Narayan,* 616 F.3d at 904 (regular pay based on a percentage of each delivery indicative of drivers' employee status).

## V.   **CONCLUSION**

Flowers cannot meet its burden to justify its classification of Mr. Russell as an "Independent Contractor."  This is so because he works within the usual course of Flowers' business and Flowers retains control over his performance. Mr. Russell is entitled to partial summary judgment as to Defendants' First Affirmative Defense, which denies any employment relationship with Mr. Russell.

[*signature of counsel appears on following page*]

1    Respectfully submitted:

2    DATED:   November 16, 2018                **NICHOLAS & TOMASEVIC, LLP**

3                                          By:    */s/  Shaun Markley*
                                                 Craig M. Nicholas
4                                                Alex Tomasevic
                                                 Shaun Markley
5                                                225 Broadway, Floor 19
                                                 San Diego, California 92101
6                                                Telephone: (619) 325-0492
                                                 Facsimile: (619) 325-0496
7                                                Email: cnicholas@nicholaslaw.org
                                                 Email: atomasevic@nicholaslaw.org
8                                                Email: smarkley@nicholaslaw.org

9                                                Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28