Frank L. Tobin CA Bar No. 166344
frank.tobin@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
4370 La Jolla Village Drive, Suite 990
San Diego, CA  92122
Telephone:  858-652-3100
Facsimile:  858-652-3101

Kevin Hishta (*Pro Hac Vice*)
kevin.hishta@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
191 Peachtree Street, N.E., Suite 4800
Atlanta, GA  30303
Telephone:  4040-881-1300
Facsimile:  404-870-1732

[*Additional Counsel Below*]

Attorneys for Defendants FLOWERS FOODS, INC.,
FLOWERS BAKING CO. OF CALIFORNIA, LLC, and
FLOWERS BAKING CO. OF HENDERSON, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMON GORO, an individual; TONY RUSSELL, an individual; REY PENA, an individual; JOSE PENA, an individual; JEFF BELANDER, an individual; GUISEPPE ZIZZO, an individual, | Case No. 17-CV-02580-TWR-JLB |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | Date:        June 2, 2021<br>Time:        1:30 p.m.<br>Courtroom:   3A |
| FLOWERS FOODS, INC., a Georgia corporation; FLOWERS BAKING CO. OF CALIFORNIA, LLC, a California limited liability company; FLOWERS BAKING CO. OF HENDERSON, LLC, a Nevada limited liability company; and DOES 1 through 100, inclusive, | Complaint Filed:  December 13, 2017<br>Trial Date:       Not Set |
| | District Judge:  Hon. Todd W. Robinson<br>Magistrate Judge: Hon. Jill L. Burkhardt |
| Defendants. | |

46370434_1.docx

Paul B. Maslo (*Pro Hac Vice*)
paul.maslo@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
8117 Preston Road, Suite 500
Dallas, TX 75225
Telephone:   214-414-0067
Facsimile:   214-987-3927

Jared L. Palmer, CA Bar No. 287974
jared.palmer@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA  94111
Telephone:   415-442-4810
Facsimile:   415-442-4870

Attorneys for Defendants FLOWERS FOODS, INC., FLOWERS BAKING CO. OF CALIFORNIA, LLC, and FLOWERS BAKING CO. OF HENDERSON, LLC

46370434_1.docx

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................ 1

II. STATEMENT OF FACTS ................................................................. 1

    A.  The Direct Store Delivery System .......................................... 2

    B.  The Distributor Model ............................................................. 3

    C.  Plaintiffs Order Out-of-State Products for Delivery to
        California Customers ............................................................... 3

    D.  Distributors Are Independent Contractors Pursuant to the
        Distributor Agreement and Defendants' Reasonable
        Expectations ............................................................................ 5

    E.  Distributors Operate their Territories Differently .................... 6

III. LEGAL STANDARD ........................................................................ 8

IV. SUMMARY JUDGMENT SHOULD BE GRANTED ......................... 9

    A.  Summary Judgment Should Be Granted as to Plaintiffs'
        Overtime Claims ..................................................................... 9

        1.  California Law Recognizes that Drivers Engaged in
            Interstate Commerce Are Exempt from Overtime
            Requirements ................................................................ 9

        2.  Flowers/California and Flowers/Henderson Qualify
            as a Motor Private Carrier ............................................ 10

        3.  Plaintiffs Regularly Distribute Goods in the Stream
            of Interstate Commerce ................................................ 11

            (a)  Plaintiffs Distribute Products that Were in a
                Practical Continuity of Movement Across
                State Lines ......................................................... 11

            (b)  Other Cases Involving Food
                Distributors/Drivers Demonstrate the
                Practical Continuity of Movement ..................... 12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

46370434_1.docx

(c)  Plaintiffs' Use of Personal Vehicles for Tasks that Do Not Involve Interstate Commerce Is Immaterial ................................................................. 14

B.  Summary Judgment Should Be Granted as to Plaintiffs' Meal and Rest Break Claims .......................................................... 15

1.  The FMCSA Preemption Ruling ...................................... 16

2.  Plaintiffs' Meal and Rest Break Claims Are Preempted ................................................................. 16

C.  Plaintiffs Cannot Recover Purported Expenses Associated with Vehicle Purchases or Leases ................................................. 17

D.  Plaintiffs' Representative PAGA Claims Fail as a Matter of Law ........................................................................................... 18

i.  Plaintiffs' Representative PAGA Claims Are Unmanageable ................................................................. 18

ii.  Plaintiffs' PAGA Notice Letter Failed to Identify Labor Code § 204, Requiring Dismissal ........................... 23

E.  The FAAAA Preempts Application of the "ABC" Test ............. 23

F.  The ABC Test is Preempted by the Federal Trade Commission Franchise Rule and the Lanham Act ...................... 25

1.  Flowers/Henderson is a Franchisor and Plaintiffs were and are Franchisees ................................................... 25

2.  Application of the ABC Test is Preempted by the FTC Franchise Rule and the Lanham Act ........................... 26

V.  CONCLUSION ................................................................................ 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

46370434_1.docx

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Coil Tubing Servs., L.L.C.*,
   846 F. Supp. 2d 678 (E.D. Tex. 2012) ................................................................. 14

*American Trucking Associations, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ....................................................................... 24, 25

*Amiri v. Cox Commc'ns Cal., LLC*,
   272 F. Supp. 3d 1187 (C.D. Cal. 2017) ................................................................ 22

*Barcamerica Int'l v. Tyfield Importers, Inc.*,
   289 F.3d 589 (9th Cir. 2002) ............................................................................... 28

*Borello & Sons, Inc. v. Department of Industrial Relations*,
   48 Cal.3d 341 (Cal. 1989) ....................................................................... 19, 20, 24

*Bowers v. First Student, Inc.*,
   No. 2:14-cv-8866-ODW (Ex), 2015 WL 1862914 (C.D. Cal. Apr.
   23, 2015) .............................................................................................................. 18

*Brown v. Am. Airlines, Inc.*,
   No. CV 10-8431-AG, 2015 WL 6735217 (C.D. Cal. Oct. 5, 2015) ..................... 22

*California Trucking Association v. Becerra*,
   433 F. Supp. 3d 1154 (S.D. Cal. 2020) ................................................................ 24

*California Trucking Association v. Su*,
   903 F.3d 953 (9th Cir. 2018) ......................................................................... 24, 25

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles
   County*,
   4 Cal.5th 903 (Cal. 2018) ....................................................................... 19, 23, 24

*Estrada v. FedEx Ground Package System, Inc.*,
   154 Cal. App. 4th 1 (2007) ............................................................................ 17, 18

*Field v. Am. Mortgage Exp. Corp.*,
   No. C-09-5972 EMC, 2011 WL 3354344 (N.D. Cal. Aug. 2, 2011) ..................... 8

46370434_1.docx

*Foxworthy v. Hiland Dairy Co.*,
　997 F.2d 670 (10th Cir. 1993) .................................................................. 11, 12, 13

*Garcia v. Border Transp. Grp., LLC*,
　28 Cal. App. 5th 558, 571 (2018), *as modified on denial of reh'g*
　(Nov. 13, 2018) .......................................................................................... 19

*Garcia v. W. Waste Servs., Inc.*,
　969 F. Supp. 2d 1252 (D. Idaho 2013) ...................................................... 15

*Hillman v. Maretta*,
　569 U.S. 483 (2013) .................................................................................. 26

*Int'l Bhd. of Teamsters, Local 2785 v. FMCSA*,
　986 F.3d 841 (9th Cir. 2021) .............................................................. 15, 16

*Litty v. Merrill Lynch & Co.*,
　No. 14-cv-0425-PA (PJWx), 2014 WL 5904904, at *3 (C.D. Cal.
　Nov. 10, 2014) ..................................................................................... 18, 19

*Lopez v. Liberty Mutual Insurance Co.*
　No. 2:14-CV-05576-AB-JCX, 2020 WL 1189841, at *1 (C.D. Cal.
　Feb. 11, 2020) ........................................................................................... 18

*LVRC Holdings, LLC v. Brekka*,
　581 F.3d 1127 (9th Cir. 2009) .................................................................... 9

*Marlo v. United Parcel Serv., Inc.*,
　No. CV 03-04336 DDP, 2009 WL 10669255 (C.D. Cal. Mar. 19,
　2009) ......................................................................................................... 10

*Martinez v. Flower Foods, Inc.*,
　No. 15-cv-5112 RGK (Ex), 2016 WL 10746664 (C.D. Cal. Feb. 1,
　2016) ......................................................................................................... 21

*McGuiggan v. CPC Int'l, Inc.*,
　84 F. Supp. 2d 470 (S.D.N.Y. 2000) ......................................................... 13

*Morris v. McComb*,
　332 U.S. 422, 431-36 (1947) .................................................................... 12

*Ortiz v. CVS Caremark Corp.*,
　No. 12-cv-05859-EDL, 2014 WL 1117614 (N.D. Cal. Mar. 19,
　2014) ......................................................................................................... 22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

*Patel v. 7-Eleven, Inc.*,
 No. 1:17-cv-11414-NMG, 2020 WL 5440623 (D. Mass. Sept. 10,
 2020) ................................................................................................................ 28

*Raphael  v. Tesoro Refining and Marketing*,
 9th Cir., Case No. 2:15-cv-02862-ODW, 2015 WL 5680310, at *3 ................... 22

*Rix v. Lockheed Martin Corp.*,
 No. 09-cv-2063-CAB NLS, 2013 WL 9988381 (S.D. Cal. Feb. 15,
 2013) ................................................................................................................ 22

*Ruiz v. Affinity Logistics Corp.*,
 No. 05-cv-2125, 2006 WL 3712942 (S.D. Cal. Nov. 9, 2006) ........................... 13

*S. Pac. Transp. Co. v. I.C.C.*,
 565 F.2d 615 (9th Cir. 1977) ........................................................................... 11

*Salazar v. McDonald's Corp.*,
 No. 14-cv-02096-RS, 2017 WL 88999 (N.D. Cal. Jan. 5, 2017) ................... 18, 22

*Schilling v. Schmidt Baking Co., Inc.*,
 876 F.3d 596 (4th Cir. 2017) ........................................................................... 14

*Schwann v. FedEx Ground Package System Inc.*,
 813 F.3d 429, 438 (1st Cir. 2016). ............................................................. 24, 25

*Shann v. Durham Sch. Servs., L.P.*,
 182 F. Supp. 3d 1044 (C.D. Cal. 2016) ............................................................ 23

*Shew v Southland Corp.*,
 370 F.2d 376 (5th Cir. 1996) ........................................................................... 13

*Soares v. Flowers Foods, Inc.*,
 320 F.R.D. 464 (N.D. Cal. 2017) ..................................................................... 21

*Walling v. Jacksonville Paper Co.*,
 317 U.S. 564 (1943) .................................................................................. 11, 12

*Watkins v. Ameripride Servs.*,
 375 F.3d 821 (9th Cir. 2004) ........................................................................... 10

*Webb v. Athens Newspapers, Inc.*,
 999 F. Supp. 1464 (M.D. Ga. 1998) .................................................................. 12

46370434_1.docx

## I.    <u>INTRODUCTION</u>

At trial, Defendants will prove that Plaintiffs Simon Goro, Tony Russell, Rey Pena, Jose Pena, Jeff Belander, and Guiseppe Zizzo ("Plaintiffs") were properly classified as independent contractors, a finding that dooms all of their claims. Through this motion for partial summary judgment, however, Defendants only seek the dismissal of certain claims and a determination of applicable law.

Plaintiffs pursue claims for allegedly unpaid overtime and meal and rest break violations under California law. Even if Plaintiffs could prove they were misclassified as independent contractors (they cannot), Plaintiffs are not eligible for overtime because their hours of service were regulated by the Department of Transportation, a finding that bars state overtime claims. Similarly, Plaintiffs' meal and rest break claims are preempted by the Federal Motor Carrier Safety Administration's Hours of Service Regulations.

Plaintiffs also seek reimbursement for purported expenses related to purchasing or leasing the vehicles they used for their businesses. Again, even if Plaintiffs could prove they were misclassified, they cannot recover these amounts because employees cannot recover for such expenditures as a matter of law.

Further, Plaintiffs' Private Attorneys General Act of 2004 claims fail as a matter of law because Plaintiffs' claims are unmanageable. The Federal Aviation Administration Authorization Act of 1994 preempts application of California's "ABC" test. Finally, the ABC test is preempted by the Federal Trade Commission Franchise Rule and Lanham Act.

## II.    <u>STATEMENT OF FACTS</u>

Plaintiff Simon Goro and Tony Russell were previously independent contractor franchisees with defendant Flowers Baking Co. of California ("Flowers/California") and then defendant Flowers Baking Co. of Henderson ("Flowers/Henderson"). The remaining Plaintiffs are currently independent contractor franchisees with defendant Flowers/Henderson and previously with

46370434_1.docx

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Flowers/California.

### A.    The Direct Store Delivery System

Defendant Flowers Foods, Inc. ("Flowers"), is the parent holding company of numerous operating subsidiaries like Flowers/Henderson, which is its own separate legal entity.[1] (Declaration of Chuck Rich ("Rich Decl."), ¶ 2.) Flowers, which is headquartered in Thomasville, Georgia, provides overall strategic direction to, and oversees the financial performance of, its subsidiaries. (*Id*.) The subsidiaries, however, manage their own respective operations and are their own separate profit and loss centers. (*Id*.)

Flowers/California operated in California from 2013 until early 2014. In early 2014, Flowers/California ceased operations and a new entity – Flowers/Henderson – was created to operate in Southern California. Entities, like Flowers/California and Flowers/Henderson, operate under a "direct store delivery" ("DSD") system. (Rich Decl., ¶ 7.) Under a DSD system, independent business owners like Plaintiffs (known as "Distributors") purchase fresh products from the subsidiaries and deliver those products directly to customers immediately after production, as opposed to going through a customer's warehouse or broker. (*Id*.) The fresh products available to Distributors to purchase and sell include baked breads, buns, rolls, and snack cakes. (*Id*.) A critical component of this distribution network is a sophisticated system of reciprocal baking whereby each subsidiary has an assigned production mission to produce items for its own market and other subsidiaries' markets. (*Id*.)

Through this system, Plaintiffs ordered and sold products that are produced by out-of-state bakeries to their customers. (*Id.* at ¶ 8.) Most of the products are manufactured outside the State of California and are transported across state lines and delivered directly by interstate truckers to the depots operated by

---

[1] Flowers/California, Flowers/Henderson and Flowers Foods, Inc. are referred to collectively herein as "Defendants."

46370434_1.docx

Flowers/Henderson. (*Id.* at ¶ 10.) Accordingly, Flowers/California was, and Flowers/Henderson is, a registered motor carrier with the U.S. Department of Transportation, Federal Motor Carrier Safety Administration ("FMCSA"). (*Id.*) The FMCSA, after conducting a safety audit of Flowers/Henderson, confirmed it could "continue to operate in interstate commerce within the United States." (*Id.*)

### B.   The Distributor Model

Flowers/California and now Flowers/Henderson implemented the independent contractor franchise model because the program had been successful in building sales at other subsidiaries. (Rich Decl., ¶ 5.) Management at these subsidiaries believe that individuals and businesses who own distribution rights have more financial incentive to develop business and generate additional sales based on their own entrepreneurial efforts and individualized sales strategies. (*Id.*) This distributor model is not novel or unique to Flowers and its subsidiaries, but has a long history and is common throughout the food-distribution industry. (*Id.*)

### C.   Plaintiffs Order Out-of-State Products for Delivery to California Customers

Flowers/California and Flowers/Henderson contracted with Plaintiffs, who purchased distribution rights to market and sell bakery products in a defined geographic territory. (Rich Decl., ¶ 14, Ex. A.) Plaintiffs' customers include chain grocery stores, independent grocery stores, restaurants, and cash customers. Some example of customers are Safeway, Whole Foods, Smart & Final, Wal-Mart, Wendy's, and Denny's. (Declaration of Frank L. Tobin ("Tobin Decl.") ¶¶ 2-7, Exs. A at 135:2-16 and 136:10-20, B at 96:2-5 and 98:1-8, C at 105:4-11, 105:24-106:2, 106:3-4, and 106:25-107:2, D at 86:7-15 and 85:2-3, E, at 91:1-15 and 92:10-12, and F at 82:22-83:7 and 88:17-19.)

As independent Distributors, Plaintiffs determine the necessary number of products for each of their customers on a regular basis. (Rich Decl., ¶ 9.) Plaintiffs place orders for products using a handheld computer, at which point the orders are

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

transmitted to the producing bakeries, many of which are located out of state. (*Id.*) Those bakeries then produce the products in response to the specific orders that are placed using the handheld computers, *i.e.*, the out-of-state bakeries produce and transport the number of products needed to fulfill the specific orders placed by Plaintiffs and other Distributors. (*Id.*) The out-of-state bakeries are aware that the products they produce in response to such orders are for end customers, and not simply a warehouse, given the structure of the DSD system, the perishable nature of the goods, and the specific quantity ordered by each Distributor. (*Id.*)

These out-of-state products are transported across state lines and delivered directly to Flowers/Henderson's depots by truck. (*Id.* at ¶ 10.) After arriving at the distribution depots, the trucks are quickly unloaded and the fresh baked products are set aside for the Distributors who placed an order. (*Id.* at ¶ 11.) Because the products have a very limited shelf life, and because customers expect fresh bread, these products are not held in any sort of inventory except in exceptional circumstances. (*Id.*) These out-of-state goods are not altered or processed during the temporary pause at the distribution depots. (*Id.*) As such, these products are in nearly continuous movement from the point of origin to the point of destination. (*Id.*)

Plaintiffs (or someone working on their behalf) typically deliver such products five days a week – Monday, Tuesday, Thursday, Friday, and Saturday. (Tobin Decl. ¶¶ 6, 7, and 11, Exs. A at 217:21-25, B at 191:13-20, C at 200:12-205:21, D at 153:6-22 and 154:13-17, E at 239:16-240:5, and F at 130:1-5) On delivery days, Plaintiffs start by going to the distribution depot to pick up the products for delivery to their customers, typically within six-to-twelve hours of when the products were delivered to the distribution depots. (Rich Decl. ¶ 11; Tobin Decl. ¶¶ 6, 7, 8, 9, and 11, Exs. A at 262:18-264:3 and 273:13-23, B at 238:9-239:10, C at 201:1-6, D at 237:7-9, E at 160:15-20, and F at 188:11-189:6, 189:17-191:8) Plaintiffs admit they typically use vehicles with a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds to deliver products. (Tobin Decl., ¶¶ 6 - 23, Exs. A at 172:13-16,

B at 140:1-2, C at 122:14-20, D at 108:13-14, E at 110:12-15, F at 101:20-102:3, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, and V.)

To the extent Plaintiffs claim to have operated their personal vehicles, it was in connection with a "pull-up" on a non-delivery day, which entails arranging product that is already on the shelf, or pulling existing product from the back room onto the shelves, but not delivering product. (Tobin Decl., ¶¶ 6, 8, 9, 10, and 11, Exs. A at 172:17-23, B at 140:10-20 and 144:10-15, C at 122:21-24, D at 108:24-109:4, E at 110:20-24, and F at 103:14-17)

Between 2013 and the present, the majority of products that were delivered to territories owned by Plaintiffs were baked in factories outside the State of California and transported across state lines to depots in San Diego County. (Rich Decl., ¶ 13.)

### D.    Distributors Are Independent Contractors Pursuant to the Distributor Agreement and Defendants' Reasonable Expectations

Another step taken to ensure the integrity of the independent distributor model was the implementation of a Distributor Agreement ("DA") between Distributors and Flowers/California and then Flowers/Henderson. The DA, which Plaintiffs initially entered into on their own behalf and later through their corporations, establishes the "DISTRIBUTOR is an independent contractor" and that "DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR's business." (Rich Decl., ¶ 14, Ex. A (DA), ¶ 4; ¶ 16.1.)[2]

The DA *does not require Plaintiffs to personally perform the services*, and permits them to hire helpers, advertise, own outside businesses, perform work elsewhere, and buy and sell their distribution rights to others, all hallmarks of an independent contractor relationship. DA ¶¶ 13.1, 15.1, 16.2, 19.2. The DA does not require distributors to wear a uniform or put logos on their vehicles, and it permits Plaintiffs to sell Defendants' products *and* outside merchandise. *Id.* at ¶¶ 5.1, 19.2.

---

[2] In 2016, Flowers/Henderson began using new Distributor Agreements that contain an arbitration agreement and class action waiver. (Declaration of Andrew Daigle ("Daigle Decl.") ¶ 7.) 22 distributors have signed these agreements. (*Id.*)

46370434_1.docx

Other than expressly *prohibiting* Defendants from controlling Plaintiffs' businesses, the DA is silent regarding the "specific details or manner" of how they may distribute products in their territories. While the DA contains the general expectation that Plaintiffs will follow "Good Industry Practice," that phrase is defined broadly as "the standards that have developed and are generally accepted and followed in the baking industry," and includes several broad, non-exhaustive examples, including "maintaining proper service and delivery . . . in accordance with [the customer's] requirements." DA ¶ 2.6. Defendants expected Plaintiffs to operate their distributorships in a manner that was consistent with the DA and an independent-contractor relationship. (Rich Decl., ¶ 15.)

## E. **Distributors Operate their Territories Differently**

Under the autonomy afforded by the DAs, Distributors are free to—and do—operate their territories in a wide variety of ways. As set forth below, without detailed individualized inquiries, it is impossible to determine *who* is even operating a given territory on a given day, much less how it is being operated.

Since December 2016, approximately 308 Distributors have contracted with Flowers/Henderson, 39 of whom own distribution rights to *multiple territories*. (Daigle Decl. ¶¶ 6, 8.) These Distributors take delivery of products from one or more of the 20 warehouses operated by Flowers/Henderson in California. (Declaration of Tyler Schoenewald ("Schoenewald Decl.") ¶ 9.) Each warehouse generally has a different area sales director ("Manager") who oversees the warehouse's operations. (*Id*.) Since 2014, there have been 25 different Managers for Flowers/Henderson. *Id*.

As noted above, the DAs allow distributors to hire helpers to run their territories *without Flowers/Henderson's knowledge or consent*. DA ¶ 16.2. Many distributors exercise this right to hire helpers and do so in varying ways. *See* SE 3-6. For example, 8 Flowers/Henderson distributors are entirely "absentee," meaning they perform *no work whatsoever* in their territories. (Daigle Decl. ¶ 9); *see also* CE 6, Campbell Decl. ¶ 15 ("I currently have agents running both of my territories."); SE

46370434_1.docx

3. Other distributors (██████████████████) hire helpers to help them run their territories in varying ways and frequencies. *See* ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████ ; SE 5.

Distributors' declarations also establish that they engage in a wide variety of entrepreneurial activities, at their discretion, to grow the value of their businesses although this, too, varies by distributor and account. *See* CE 5, Aldrich Decl. ¶ 10 ("Owning a distributorship involves being good at sales—it is all about the hustle and positioning your product and getting incremental sales from a displays… For example, I will try to get a bagel display set up by cream cheese when bagels are on sale."); *see also* SE 13-16.

Various distributors also actively solicit and add new customers within their territories to increase their sales and profits. *See* SE 14. Others do not. *See* CE 4, Aguirre Decl. ¶ 9 ("Although I am free to get additional cash accounts to further expand my business, I have decided to focus my time and attention on working with my current accounts to help expand their orders."); SE 13.

While some distributors report that customers set their schedules, others report they set their own schedules. (SE 7.[3]) And, some Distributors comply with their customers' service requirements, while others may not. (SE 8, 9.) ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[3] To the extent Plaintiffs contend Distributors are constrained by customer's service windows, this also necessarily varies given different customer mixes. (SE 12.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

46370434_1.docx

1 ███████████████████████████████████████████

2 ██████████████ (Ex. B, Russell Tr. 192:8-10.)

3   Further, some distributors determine what products to order for their

4 customers without input from sales management, while others say sales management

5 makes changes to their orders or recommends that they order certain products. *See*

6 SE 10. And, even when Flowers/Henderson makes suggestions on products,

7 distributors do not always follow them. *See* SE 10, 19. Similarly, some distributors

8 claim that they receive a lot of suggestions from the Managers, which they may or

9 may not follow. Some claim they rarely, if ever, follow such suggestions. *See* SE 19.

10 Distributors' level of interaction with Managers also varies. *See* SE 20. Different

11 Managers also have different levels of interaction with the same Distributors. *Id.*

12   Distributors' earnings vary depending on their sales, with some making up to

13 $180,000 a year in gross profits. (Compendium of Evidence ("CE") 1, Rodriguez

14 Decl. ¶ 45.) The composition of customers varies by Distributor; different customers

15 have different requirements and needs. (Summary of Evidence ("SE") 8, 13.)

16   Distributors also use different types of vehicles, some use logos and advertise

17 on them, and some use multiple vehicles. *See* SE 17. The clothing worn by

18 distributors also varies. *See* SE 18.

## III.   <u>LEGAL STANDARD</u>

20   Summary judgment should be granted in whole or in part where "there is no

21 genuine dispute as to any material fact and . . . the movant is entitled to judgment as

22 a matter of law." Fed. R. Civ. Proc. 56(a). "Where the plaintiff has the ultimate

23 burden of proof, the defendant may prevail on a motion for summary judgment

24 simply by pointing to the plaintiff's failure to make a showing sufficient to establish

25 the existence of an element essential to the plaintiff's case." *Field v. Am. Mortgage*

26 *Exp. Corp.*, No. C-09-5972 EMC, 2011 WL 3354344, at *3 (N.D. Cal. Aug. 2, 2011)

27 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (internal quotations

28 omitted). To avoid summary judgment, the non-moving party must produce

46370434_1.docx

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

"evidence that is significantly probative or more than 'merely colorable' that a genuine issue of material fact exists for trial." *LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009).

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED

### A.   Summary Judgment Should Be Granted as to Plaintiffs' Overtime Claims

All of Plaintiffs' claims fail because Plaintiffs were independent contractors and not employees. But even if Plaintiffs could show they were misclassified, their overtime claims fail as a matter of law because they were overtime exempt.

#### 1.   California Law Recognizes that Drivers Engaged in Interstate Commerce Are Exempt from Overtime Requirements.

Plaintiffs are pursuing their overtime claims under California law. Following federal law, California recognizes that drivers who are engaged in interstate commerce are not entitled to overtime. The FLSA specifically exempts from overtime any persons "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" under the Motor Carrier Act of 1935, 49 U.S.C. § 31502 (referred to herein as the "MCA" or "motor carrier exemption"). 29 U.S.C. § 213(b)(1).

Drivers who are exempt from federal overtime requirements under the MCA are also exempt from California's overtime requirements. *See* IWC Wage Order No. 1-2001, § 3(A)(2) (July 1, 2002) (Wage Order"); Cal. Code Regs. tit. 8, § 11010(3)(A)(2).[4] California goes *further* than federal law, however, in exempting drivers subject to regulation by either "(1) The United States Department of Transportation Code of Federal Regulations, Title 49, Sections 395.1 to 395.13,

---

[4] As a bakery, Wage Order 1 applies to defendants. *See* "Which Wage Order Applies," published by the Division of Labor Standards and Enforcement at https://www.dir.ca.gov/dlse/whichiwcorderclassifications.pdf (listing "Food processing" including "Bakeries (non-retail)" as falling within the Manufacturing Industry).

46370434_1.docx

Hours of Service of Drivers" *or* "Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200 and the following sections, regulating hours of drivers[.]" *Id*. Consequently, the first "issue before us is whether [the plaintiff] was engaged in transporting property in interstate commerce so as to be subject to the federal regulations referenced in the IWC order. If so, [a plaintiff] is not entitled to overtime pay in California." *Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004). But, even if Plaintiffs were only subject to regulation by California authorities, they are still exempt from overtime.

"To establish that the [DOT] has jurisdiction over an employee and the overtime provisions therefore do not apply to that employee, an employer must show that (1) the employer is a motor carrier pursuant to 49 U.S.C. § 31502 and (2) the employee was engaged in safety-affecting activities in interstate commerce." *Marlo v. United Parcel Serv., Inc.*, No. CV 03-04336 DDP (RZx), 2009 WL 10669255, at *4 (C.D. Cal. Mar. 19, 2009).

### 2. Flowers/California and Flowers/Henderson Qualify as a Motor Private Carrier

Under the MCA, the Secretary has authority over drivers who are employed by either a "motor carrier" or "motor private carrier." A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). A "motor private carrier" is defined as:

> [A] person, other than a motor carrier, transporting property by motor vehicle when—(A) the transportation is as provided in 13501 . . . [interstate commerce]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise. 49 U.S.C. §13102(15).

Here, Flowers/Henderson (and, previously, Flowers/California) is a registered DOT motor carrier. (Rich Decl., ¶ 10.) Flowers/Henderson regularly transports baked goods across state lines in the stream of interstate commerce. (*Id*.) Flowers is the owner or bailee of the property being transported, depending upon the

46370434_1.docx

circumstances and such distribution is conducted to further Flowers/Henderson's business. (Schoenewald Decl., ¶¶ 2-8.) As such, this element of the motor carrier exemption is satisfied.

### 3.    Plaintiffs Regularly Distribute Goods in the Stream of Interstate Commerce

Interstate commerce, for purposes of the MCA, occurs not only when the driver actually transports goods across state lines, but also when there is a "practical continuity of movement from the manufacturers or suppliers without the state, through [a] warehouse and on to customers whose prior orders or contracts are being filled." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567, 569 (1943); *see also* 29 C.F.R. § 782.7(b)(1) (interstate commerce element satisfied where the "vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce."). Thus, out-of-state goods shipped to a warehouse, where they are transferred to a local driver for delivery to the end customer for whom the goods were originally intended, are in a "practical continuity of movement" if the pause at the warehouse is merely an "efficient opportunity to convert the means of delivery from one form of transportation to the other." *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 673 (10th Cir. 1993). Whether the transportation is interstate or intrastate depends on the "essential character of the shipment," which is dependent on the shipper's "fixed and persisting intent." *S. Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 617 (9th Cir. 1977).

### (a)    Plaintiffs Distribute Products that Were in a Practical Continuity of Movement Across State Lines

As set forth in the above Statement of Facts, the uncontroverted evidence establishes Plaintiffs distribute products that are in a practical continuity of movement from out-of-state manufacturers to in-state recipients through the DSD

46370434_1.docx

model. (Rich Decl., ¶¶ 7-11.)[5], [6] Indeed, more than 90% of the goods distributed by Plaintiffs were baked outside of California. (*Id*. at ¶ 16.)

The perishable nature of the goods Plaintiffs deliver, and their limited shelf life, confirm the goods remain in interstate commerce until reaching the end customer. This non-fungible nature of these goods make it clear the producing bakeries *do not* intend for the goods to remain in inventory, but continue in interstate commerce and reach the end customers as soon as possible. *See, e.g.*, *Webb v. Athens Newspapers, Inc.*, 999 F. Supp. 1464, 1471-1472 (M.D. Ga. 1998) (the "strongest evidence" that the out-of-state newspaper supplements were intended to (and did) remain in interstate commerce until delivery to the end customers was that they were non-fungible in nature and lost their value if not delivered immediately).

(b)   <em>Other Cases Involving Food Distributors/Drivers Demonstrate the Practical Continuity of Movement</em>

Other cases involving food distributors or delivery drivers demonstrate that Plaintiffs deliver out-of-state products in the practical continuity of movement. In *Foxworthy v. Hiland Dairy Co.*, the Tenth Circuit held that a driver who delivered milk and cheese products was exempt from overtime under the FLSA. *Foxworthy*, *supra*, 997 F.2d at 670. The plaintiff ordered products from Hiland Dairy Company for delivery to his customers in Ponca City, Oklahoma. *Id*. at 671. Upon receiving

---

[5] As the Supreme Court observed in *Walling*, 317 U.S. at 568: "The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey.  A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act . . . . [I]f the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points . . . . Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce."

[6] The fact that Plaintiffs may also distribute products that are produced in California does not change the result.  For example, in *Morris v. McComb*, the Supreme Court held that drivers who only spent 4% of their trips involved in interstate commerce were still exempt from the FLSA's overtime requirements.  332 U.S. 422, 431-36 (1947).  Here, many of the products distributed in Plaintiffs territories were produced out of state.  (Rich Decl., ¶¶ 13, 16.)

46370434_1.docx

plaintiff's orders, Hiland Dairy Company shipped products from Arkansas to a distribution center in Oklahoma City, Oklahoma. *Id*. The products were then refrigerated overnight before being transported to Ponca City, where the plaintiff would load his delivery truck and make intrastate deliveries. *Id*. at 671-72. Even though the plaintiff's transportation efforts were purely within Oklahoma, the Tenth Circuit concluded the plaintiff was engaged in interstate commerce because the defendant had a fixed and persisting intent at the time of shipment based on specific customer orders and because "the products were not processed in any way and were not held in storage or inventory pending the receipt of actual orders." *Id*. at 673-74; *see also Shew v Southland Corp.,* 370 F.2d 376, 380 (5th Cir. 1996);

The *McGuiggan* case, which also involved bakery distributors, is likewise illustrative. *McGuiggan v. CPC Int'l, Inc.*, 84 F. Supp. 2d 470 (S.D.N.Y. 2000). Dismissing the plaintiffs' overtime claims, the district court observed that the defendant "baked the English muffins in New Jersey, and New York customers served by the plaintiffs (and the plaintiffs themselves) called their orders in to New Jersey. **If this does not qualify as interstate commerce, I am hard pressed to understand what is**." *Id*. at 483 (emphasis added).[7] This conclusion was not changed by "the 'ritual' of placing goods in a warehouse before subsequent delivery to customers within the same state," nor was it affected "[e]ven where the driver performs duties other than, or in addition to, driving." *Id*.[8]

Here, the record evidence establishes Plaintiffs transport out-of-state products

---

[7] *See also Ruiz v. Affinity Logistics Corp.*, No. 05-cv-2125, 2006 WL 3712942, at *2, *8 (S.D. Cal. Nov. 9, 2006) (granting summary judgment based on motor carrier exemption where plaintiff did not drive across state lines but where shipper had an intent to ship Sears appliances to a specific destination).

[8] It also is not necessary that the shipper know specifically which goods are earmarked for a particular customer, only that the goods will ultimately continue from the warehouse to a customer in a state different from that of the shipper. *See Shew,* 370 F.2d at 378, 380 (shipper had fixed and persisting intent beyond terminal storage point at time of shipment even though orders were consolidated); Dep't of Labor Opinion Letter FLSA 2005-2NA, 2005 WL 5419038 (Apr. 27, 2005); Dep't of Labor Opinion Letter, 1999 WL 1002364 (Feb. 10, 1999) (same).

46370434_1.docx

that are intended to, and do, remain in interstate commerce. Plaintiffs are engaged in interstate commerce and exempt from overtime.

### (c) Plaintiffs' Use of Personal Vehicles for Tasks that Do Not Involve Interstate Commerce Is Immaterial

Plaintiffs may argue they are nevertheless entitled to overtime because they used personal vehicles that weighed less than 10,001 pounds in connection with their distributorships. Defendants anticipate that such an argument would be based on the limited overtime exception contained in SAFETEA-LU Technical Corrections Act of 2008, Pub. L. 110-224, 122 Stat. 1572 ("TCA") for drivers who drive non-commercial vehicles (which is defined to include vehicles under 10,001 pounds).

As noted above, Plaintiffs are pursuing their overtime claims under California law. Thus, *the TCA is inapplicable*, as that exception is an amendment to the FLSA *only* and does not affect claims under California law. The Wage Order establishes that Plaintiffs cannot recover overtime under California law *if they are subject to regulation by the Secretary of Transportation*. Any finding that Plaintiffs were "covered employees" under the TCA (and, therefore, *subject to the Secretary's jurisdiction*) would compel the dismissal of the Plaintiffs' state law overtime claim, since the Wage Order does *not* contain an exception to the exemption similar to that created by the TCA. *See Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 603 (4th Cir. 2017) (dismissing state law overtime claims).

Significantly, the TCA grants the Secretary of Transportation's authority to cover motor vehicles *of any weight. Allen v. Coil Tubing Servs., L.L.C.,* 846 F. Supp. 2d 678, 692 (E.D. Tex. 2012). Thus, the TCA further strengthens the Defendants' motor carrier defense. That defense, as noted above, is applicable to *all* employees *subject to federal DOT jurisdiction*, and is not qualified by the personal vehicle amendment. To put it another way, the "personal vehicle" use issue, which has divided courts under the FLSA, is *inapplicable* to the overtime claims asserted here.

Even assuming, arguendo, the limited overtime amendment of the TCA

applied to California claims, the Plaintiffs here have testified that they only used their personal vehicle conducting pull-ups (when Plaintiffs go to existing accounts and pull product that has already been dropped off in the back room to put on the shelves). (Tobin Decl., ¶¶ 6, 8, 9, 10, and 11, Exs. A at 172:17-23, B at 140:10-20 and 144:10-15, C at 122:21-24, D at 108:24-109:4, E at 110:20-24, and F at 103:14-17.) This does not count as non-exempt time. With a pull-up, the product has already come to rest when it was placed in the back room of the account; *it no longer remains in interstate commerce*. Thus, use of the personal vehicle for pull-ups is purely *intra*state. *See, e.g., Garcia v. W. Waste Servs., Inc.,* 969 F. Supp. 2d 1252, 1261 (D. Idaho 2013) (because the plaintiff did not transport product in interstate commerce when using a personal vehicle, the MCA exemption still applied). In short, in order to be a "covered employee" under the TCA and trigger potential overtime, the employee must use his *personal vehicle* in *inter*state commerce. That did not happen here.

Thus, even if Plaintiffs established employment status, they are engaged in interstate commerce and exempt from overtime under state law.

## B. Summary Judgment Should Be Granted as to Plaintiffs' Meal and Rest Break Claims

Plaintiffs' meal and rest period claims are also preempted by federal transportation law. The Federal Motor Carrier Safety Administration ("FMCSA") has found that California's meal and rest break laws do not apply to property-carrying commercial motor vehicle drivers subject to the FMCSA's hours of service rules ("HOS rules").[9] The Ninth Circuit recently upheld the FMCSA opinion and confirmed that California's meal and rest break laws do not apply to persons—like Plaintiffs—carrying property in interstate commerce. *Int'l Bhd. of Teamsters, Local 2785 v. FMCSA*, 986 F.3d 841 (9th Cir. 2021).

---

[9] California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers; Petition for Determination of Preemption, 83 Fed. Reg. 67,480 (Dec. 28, 2018).

46370434_1.docx

### 1.     The FMCSA Preemption Ruling

The Motor Carrier Safety Act of 1984 (the "Act") prohibits States from enforcing a law or regulation on commercial motor vehicle safety that the Secretary of Transportation has determined to be preempted. 49 U.S.C. § 31141(a). Pursuant to its Congressionally granted authority, the FMCSA held in December 2018 that California's meal and rest break laws are "more stringent than the Agency's hours of service regulations, that they have no safety benefits that extend beyond those already provided by the Federal Motor Carrier Safety Regulations, that they are incompatible with the Federal hours of service regulations, and that they cause an unreasonable burden on interstate commerce." 83 Fed. Reg. 67,480. The laws, therefore, "are preempted under 49 U.S.C. 31141(c)" and may no longer be enforced "with respect to drivers of property-carrying [commercial motor vehicles] subject to FMCSA's HOS rules." *Id.*

Critically, the Ninth Circuit has upheld the FMCSA preemption order after reviewing challenges by the Teamsters union and others. 986 F.3d at 854 ("We therefore hold that the FMCSA permissibly determined that California's MRB rules were State regulations 'on commercial motor vehicle safety,' so that they were within the agency's preemption authority. 49 U.S.C. § 31141(a).").

Drivers are presumptively subject to the HOS rules if they operate a "property-carrying commercial motor vehicle." 49 C.F.R. §§ 395.1(a)(1), 395.3(a). A "commercial motor vehicle," in turn, is defined as "any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property" that has "a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater." 49 C.F.R. § 390.5.

### 2.     Plaintiffs' Meal and Rest Break Claims Are Preempted

As established above, Plaintiffs operate "commercial motor vehicles" and are therefore subject to the HOS rules. First, Plaintiffs admit they typically use vehicles

46370434_1.docx

with a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds to deliver products. (Tobin Decl., ¶¶ 6-23, Exs. A at 172:13-16, B at 140:1-2, C at 122:14-20, D at 108:13-14, E at 110:12-15, F at 101:20-102:3, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, and V.) Second, they deliver these products in interstate commerce. (Rich Decl., ¶¶ 7-13, 16.) Thus, Plaintiffs are "drivers of property-carrying [commercial motor vehicles] subject to FMCSA's HOS rules" 83 Fed. Reg. 67,480.  California's meal and rest break laws *cannot* be applied to Plaintiffs. *Id.* Plaintiffs' meal and rest break laws are preempted and must be dismissed.

### C.   <u>Plaintiffs Cannot Recover Purported Expenses Associated with Vehicle Purchases or Leases</u>

Through their sixth and seventh causes of action, Plaintiffs seek reimbursement under Labor Code § 2802 for several categories of alleged business expenses, including the "purchase or lease of [their] vehicle[s]." ECF No. 95 (Second Amended Compl.), ¶ 54). But Plaintiffs are barred from recovering expenses associated with vehicle purchases or leases.

The California Division of Labor Standards and Enforcement ("DLSE") has consistently held that, although the costs of *operating* a motor vehicle in the course of employment may be covered by Section 2802, the costs of *furnishing* the vehicle itself are not. *See DLSE Interpretive Bulletin* No. 84-7 (Jan. 8, 1985) ("[A]n applicant for employment may be required, as a condition of employment, to furnish his[ ] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid. In *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1 (2007), the California Court of Appeal adopted the DLSE's reasoning when it affirmed a trial court's finding that the plaintiffs "were not entitled to reimbursement for expenses related 'to purchasing or leasing a vehicle for the purpose of performing pick up and delivery services' because 'employers in the pick-up and delivery industry in California can require as a condition of employment that their drivers, at their own expense, purchase or lease a truck to the employer's

specifications.'" *Id.* at 21-22. Thus, Plaintiffs cannot recover the costs they allegedly incurred in purchasing, leasing, renting, or otherwise obtaining the vehicles they used to operate their distributorships.

### D.      Plaintiffs' Representative PAGA Claims Fail as a Matter of Law

The Court should grant Defendants' motion for partial summary judgment on all of Plaintiffs' representative PAGA claims because they are unmanageable and on the Labor Code § 204 claim for the additional reason that it is not listed in Plaintiffs' PAGA notice letter.

### i.      Plaintiffs' Representative PAGA Claims Are Unmanageable

Courts "have been careful not to hold that PAGA actions can never be maintained wherever individual assessments are required because every PAGA action in some ways requires some individualized assessment regarding whether a Labor Code violation has occurred." *Salazar v. McDonald's Corp.*, No. 14-cv-02096-RS, 2017 WL 88999, at *8 (N.D. Cal. Jan. 5, 2017) (citations omitted). Nonetheless, "[t]hey have stricken or dismissed representative PAGA claims where[, as is the case here,] the evidence shows that numerous individualized determinations would be necessary to determine whether any class member has been injured." *Id.* (citations omitted). *See also Bowers v. First Student, Inc.*, No. 2:14-cv-8866-ODW (Ex), 2015 WL 1862914, at *4 (C.D. Cal. Apr. 23, 2015) (noting that "[a] PAGA claim can be considered unmanageable when a multitude of individualized assessments would be necessary"); *Litty v. Merrill Lynch & Co.*, No. 14-cv-0425-PA (PJWx), 2014 WL 5904904, at *3 (C.D. Cal. Nov. 10, 2014) (dismissing PAGA claim as "unmanageable because a multitude of individualized assessments would be necessary").

For example, in *Lopez v. Liberty Mutual Insurance Co.*, plaintiffs, who worked as claims adjusters, alleged that that were misclassified as administratively exempt under California's Labor Code. No. 2:14-CV-05576-AB-JCX, 2020 WL 1189841, at *1 (C.D. Cal. Feb. 11, 2020). Defendants moved to strike plaintiffs'

representative PAGA claims, citing manageability concerns. *Id.* at *1, *5. In evaluating defendants' argument, the court noted that determining whether a worker is properly classified as exempt requires the consideration of several factors, including whether the worker operates under only general supervision. *Id.* at *2. Because "[d]efendants . . . presented evidence that the degree of supervision varie[d] dramatically for individual class members[,]" the court granted their "motion to strike [p]laintiffs' PAGA claims as unmanageable." *Id.* at *3-*5. In coming to that conclusion, the court relied on *Litty*, 2014 WL 5904904, at *3, and found that "resolving [p]laintiffs' PAGA claims would require a litany of individualized assessments to determine whether individual plaintiffs were subject to mere general supervision." *Id.* at *5.

Here, things are even more complicated than they were in *Lopez* because *two different tests* apply for determining whether Plaintiffs are correctly classified as independent contractors for the period before California Assembly Bill 5 went into effect on January 1, 2020: the common-law test from *Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (Cal. 1989), applies to Plaintiffs' alleged non-wage-order PAGA claims, such as for failure to indemnify necessary expenses and waiting-time penalties; and the "ABC" test from *Dynamex Operations West, Inc. v. Superior Court of Los Angeles County*, 4 Cal.5th 903 (Cal. 2018) ("*Dynamex*"), applies to PAGA claims arising under the wage orders. *See, e.g.*, *Garcia v. Border Transp. Grp., LLC*, 28 Cal. App. 5th 558, 571 (2018), *as modified on denial of reh'g* (Nov. 13, 2018) (applying the "ABC" test to only wage-order claims, but not to claims for expense reimbursement and waiting-time penalties). Each test requires the evaluation of multiple factors.

*Borello* relies on numerous "individual factors" that "cannot be applied mechanically" because they are "intertwined and their weight depends on different combinations." 4 Cal.3d at 351 (quotation marks omitted). The principal test is whether the "person to whom service is rendered has the right to control the manner

46370434_1.docx

and means of accomplishing the result desired[.]" *Id.* at 350 (quotation marks omitted). There are also numerous secondary factors that are relevant to the determination: whether the one performing services is engaged in a distinct occupation or business; the kind of occupation; the skill required; whether the principal or the worker supplies the instrumentalities, tools, and the place of work; the length of time for which the services are to be performed; the method of payment; whether the work is a part of the regular business of the principal; and whether the parties believe they are creating the relationship of employer-employee. *Id.* at 351. In addition, the factfinder should consider the alleged employee's "opportunity for profit or loss depending on his or her managerial skill" and "investment in equipment or materials required for his task, or his employment of helpers." *Id.* at 355.

The "ABC" test also requires the application of several factors. Specifically, Defendants must establish the following: "(A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity." *Id.* at 916-17.

Engaging with either test—much less both of them—would require numerous individualized determinations. As discussed above in the Statement of Facts, there are stark differences between Distributors in how they set their schedules, decide what products to order, service their accounts, engage in marketing and promotional activities related to their businesses, and interact with management. Moreover, several Distributors hire helpers to service their territories—in whole or in part—without Flowers' knowledge. As such, individualized inquiries would be necessary to determine whether Defendants controlled Plaintiffs and the large group of other

Case No. 17-CV-02580-TWR-JLB

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

46370434_1.docx

"aggrieved employees" they seek to represent. Determining whether "aggrieved employees" engaged in an independent occupation or business also cannot be determined without probing into their individual circumstances, including whether they used helpers or employees to operate their businesses and provided delivery services for other companies. Similarly, determining whether each "aggrieved employee" and Defendants believed they were creating an employer-employee relationship would require nothing short of a sworn statement from each individual Distributor. These and other highly individualized determinations are necessary to decide only the threshold issue of whether Distributors are properly classified.

If Plaintiffs can clear that hurdle, a number of other highly individualized inquiries would be required to prove their actual claims. Individual inquiries will be needed to determine whether the expenses "aggrieved employees" seek reimbursement for were actually incurred and, if so, whether they were reasonable and necessary; whether they authorized in writing the alleged unlawful deductions from their settlement statements; whether they worked enough time to be entitled to take a meal and/or rest break on any given day and whether they had the opportunity to take those breaks; and whether they worked overtime. These determinations would require a day-by-day or week-by-week analysis for each Distributor.

Significantly, the court denied plaintiffs' motion for class certification based on similar manageability concerns in *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 486 (N.D. Cal. 2017):

> Trying this lawsuit as a class action presents manageability issues given the individual inquiries necessary to establish [d]efendants' liability for each of the putative class members. For example, the [c]ourt would need to hold mini-trials to determine which drivers "personally serviced" their routes, when, and for how many hours and whether they did deliveries for other companies in order to analyze whether a particular driver was engaged in a business distinct from other class members . . . There would also need to be individualized inquiries into how to treat [d]istributors who may have owned more than one territory.

*See also Martinez v. Flower Foods, Inc.*, No. 15-cv-5112 RGK (Ex), 2016 WL 10746664, at *13 (C.D. Cal. Feb. 1, 2016) ("In sum, the [c]ourt concludes that

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

46370434_1.docx

individual issues predominate as to the question of whether [d]efendants improperly classified class members as independent contractors instead of employees.").

Because the circumstances of this case require a multitude of individualized assessments, the Court should dismiss Plaintiffs' representative PAGA claims. *See, e.g., Amiri v. Cox Commc'ns Cal., LLC*, 272 F. Supp. 3d 1187, 1195 (C.D. Cal. 2017) (holding PAGA meal and rest break claims unmanageable because "the [c]ourt would be required to determine (1) whether each individual took a particular meal or rest break (2) on a particular occasion and (3) if the individual skipped the break, why it was skipped for each of the around 1,000 aggrieved employees"); *Salazar*, 2017 WL 88999, at *3 (dismissing PAGA claim because, "[a]t bottom, the question of belief turns on an individualized inquiry"); *Brown v. Am. Airlines, Inc.*, No. CV 10-8431-AG (PJWX), 2015 WL 6735217, at *4 (C.D. Cal. Oct. 5, 2015) ("The Court finds manageability issues exist regarding PAGA overtime claims here. There appears to be too many individualized assessments to determine PAGA violations concerning overtime pay."); *Raphael*, 2015 WL 5680310, at *3 ("[G]athering inquires for each of these [claimed] expenses from Raphael and all aggrieved employees would be nothing short of unmanageable."); *Ortiz v. CVS Caremark Corp.*, No. 12-cv-05859-EDL, 2014 WL 1117614, at *4 (N.D. Cal. Mar. 19, 2014) (dismissing PAGA claim seeking expense reimbursement as "unmanageable").

Indeed, dismissal is particularly appropriate here because Plaintiffs bring PAGA claims on behalf of a large group of allegedly "aggrieved employees" based on eight separate purported violations, citing 14 different Labor Code sections. *See, e.g., Rix v. Lockheed Martin Corp.*, No. 09-cv-2063-CAB NLS, 2013 WL 9988381, at *2 (S.D. Cal. Feb. 15, 2013) ("Plaintiff is seeking to establish 15 separate Labor Code violations as to the 88 ISRs […] This means that [p]laintiff's PAGA claim requires [p]laintiff to prove Labor Code violations for over one thousand claims. The Court is not persuaded that this can be done through common evidence.").

46370434_1.docx

### ii.    Plaintiffs' PAGA Notice Letter Failed to Identify Labor Code § 204, Requiring Dismissal

PAGA's administrative exhaustion requirements mandate that Plaintiffs list the "specific provisions of [the Labor Code] alleged to have been violated" in their pre-filing notice letter. Lab. Code § 2699.3(a)(1)(a). If a specific Labor Code section is not listed in the PAGA notice letter, it cannot be included in a subsequent PAGA cause of action and must be dismissed. *See Shann v. Durham Sch. Servs., L.P.*, 182 F. Supp. 3d 1044, 1047 (C.D. Cal. 2016). Here, Plaintiffs' ninth cause of action includes a claim for PAGA penalties based on alleged violations of Labor Code § 204. ECF 95, ¶ 72(f). But Labor Code § 204 is not listed in Plaintiffs' PAGA notice letter. (Tobin Decl., Ex. W.) Plaintiffs' claim for PAGA penalties based on alleged violations of section 204 must therefore be dismissed.[10]

### E.    The FAAAA Preempts Application of the "ABC" Test

The FAAAA provides that "a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to* a price, route, or *service* of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (emphasis added). The FAAAA preempts the "ABC" test articulated in *Dynamex,* and subsequently codified by Assembly Bill 2257, otherwise knowns as AB-5, in Labor Code section 2750.3, because it precludes Defendants from using independent contractors to perform a service that is within the usual course of their business.

As explained above in section IV(A)(2), the entity that contracted with Plaintiffs is a motor private carrier. Recently, the State of California was enjoined

---

[10] Plaintiffs' expert report also includes calculations of PAGA penalties for violations of Labor Code §§ 226.8 and 256. Neither section is listed in Plaintiffs' PAGA notice letter or their ninth cause of action. (ECF 95, ¶ 72; Tobin Decl., Ex. W.) Because these claims are not pled, Defendants do not move to dismiss them here. But to the extent Plaintiffs later seek penalties based on these provisions, they will be barred from doing so.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

46370434_1.docx

1   from enforcing the "ABC" test by the Southern District of California in *California*
2   *Trucking Association v. Becerra*, 433 F. Supp. 3d 1154 (S.D. Cal. 2020) ("*CTA v.*
3   *Becerra*"). There, the Honorable Roger T. Benitez found that AB-5 and its ABC test
4   are likely preempted by federal law because they "would transform California into
5   its own patch in the very 'patchwork' of state-specific laws Congress intended to
6   prevent." *Id.* at 1169. Observing that FAAAA preemption has limits, Judge Benitez
7   concluded, "[h]ere, however, there is little question that the State of California has
8   encroached on Congress' territory be eliminating motor carriers' choice to use
9   independent contractor drivers. . ." *Id.* at 1171. *CTA v. Becerra* is currently on
10  appeal (Nos. 20-55106 and 20-55107).

11      Though litigants are waiting for further guidance from the Ninth Circuit, its
12  previous decision in *California Trucking Association v. Su*, 903 F.3d 953 (9th Cir.
13  2018) ("*CTA v. Su*"), is instructive. There, the Ninth Circuit ruled that the FAAAA
14  does not preempt the *Borello* standard for determining whether a worker is properly
15  classified as an independent contractor, *id.* at 957, but it forecasted that the result
16  would likely have been different if *Dynamex*'s "ABC" test were at issue.

17      In evaluating the *Borello* standard, the court contrasted its decision in
18  *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir.
19  2009), where it "concluded that the FAAAA likely preempted the Ports of Los
20  Angeles and Long Beach's directive that carriers must use only employee drivers[.]"
21  *Id.* at 964. "As compared to the *Borello* standard, which sets a background rule for
22  ensuring a driver is correctly classified, *American Trucking* stands for the *obvious*
23  *proposition* that an 'all or nothing' rule requiring services be performed by certain
24  types of employee drivers . . . was *likely preempted*." *Id.* (emphasis added). The
25  court applied the same logic to distinguish the First Circuit's holding in *Schwann v.*
26  *FedEx Ground Package System* that the FAAAA preempts the second prong of the
27  Massachusetts "ABC" test (which mirrors the test in *Dynamex*):

28      Like *American Trucking*, the "ABC" test may effectively compel a

46370434_1.docx

motor carrier to use employees for certain services because, under the "ABC" test, a worker providing a service within an employer's usual course of business will never be considered an independent contractor. For a motor carrier company, this means it may be difficult to classify drivers providing carriage services as independent contractors.

*CTA v. Su*, 903 F.3d at 964 (internal citations omitted).[11]

Based on this case law, this Court and the Ninth Circuit (following Judge Benitez) should find that the FAAAA "obviously" preempts *Dynamex*'s "ABC" test. *See, e.g.*, *id.* at 964 ("*American Trucking* stands for the *obvious proposition* that an 'all or nothing' rule requiring services be performed by certain types of employee drivers . . . was likely preempted . . . . Like *American Trucking*, the 'ABC' test may effectively compel a motor carrier to use employees for certain services[.]") (emphasis added).

## F.  The ABC Test is Preempted by the Federal Trade Commission Franchise Rule and the Lanham Act

Because Plaintiffs are franchisees, application of the ABC test is preempted by the Federal Trade Commission Franchise Rule and the Lanham Act. *See* 16 C.F.R. §§ 436, *et seq.* (hereinafter the "FTC Franchise Rule"); 15 U.S.C. §§ 1051, *et seq.* (hereinafter the "Lanham Act").

### 1.  Flowers/Henderson is a Franchisor and Plaintiffs were and are Franchisees

Flowers/Henderson manufacture various bakery products, which are then sold

---

[11] In *Schwann*, the First Circuit applied preemption for numerous reasons, including that the second prong of the "ABC" test "requires a court to define the degree of integration that a company may employ by mandating that any services deemed 'usual' to its course of business be performed by an employee," which "poses a serious potential impediment to the achievement of the FAAAA's objectives because a court, rather than the market participant, would ultimately determine what services that company provides and how it chooses to provide them." 813 F.3d 429, 438 (1st Cir. 2016). "Prong 2 also stands as something of an anomaly because it makes any person who performs a service within the usual course of the enterprise's business an employee for state wage law purposes. By contrast, under […] the law of many states, the relationship between the service performed and the usual course of the enterprise's business is simply one among many factors to be considered." *Id.* (citations omitted).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

46370434_1.docx

and distributed to retail stores and other customers through a network of independent franchise distributors. (Rich Decl., ¶¶ 17-20.) Plaintiffs, as franchise distributors, purchased the exclusive right to sell certain products bearing trademarks and/or tradenames of Flowers/Henderson or its affiliates. *Id.* Accordingly, under the FTC Franchise Rule and California Law, Plaintiffs, and each distributor contracting with Flowers/Henderson, is a franchisee and Flowers/Henderson the franchisor. *See* 16 C.F.R. §§ 436.1(h) (FTC Franchise Rule defining "franchise"); Cal. Corp. Code § 31005(a) (California Franchise Investment Law defining "franchise").

Moreover, throughout its dealings with Plaintiffs, Flowers/Henderson has consistently treated Plaintiffs as franchisees, complying with registration requirements and affording Plaintiffs the benefits, protections, and remedies unique to the franchise relationships. (Rich Decl., ¶¶ 17-20.) In fact, such benefit began even before Plaintiffs entered into their Distributor Agreements, as Flowers/Henderson provided each of the Plaintiffs with a Franchise Disclosure Document, affording Plaintiffs the opportunity to review a plain language discussion of the franchise relationship before prior to their decision to enter such a relationship. (*Id.* at ¶ 19; Tobin Decl., Exs. A-F, Z-EE.)

### 2. Application of the ABC Test is Preempted by the FTC Franchise Rule and the Lanham Act

Because Plaintiffs are franchisees, the application of the ABC test to Plaintiffs is preempted by the FTC Franchise Rule and the Lanham Act. "State law is pre-empted 'to the extent of any conflict with a federal statute,'" and "[s]uch a conflict occurs when compliance with federal and state regulations is impossible . . . or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (internal citations omitted).

To begin with, application of the ABC Test to the franchisees in this case would convert all franchise relationships into employment relationships, stripping

46370434_1.docx

the FTC of its authority to regulate and safeguard the sale of franchises. Under the FTC Franchise Rule, a "franchise" is defined as "any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that ... [t]he franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation." 16 C.F.R. § 436.1 (emphasis added). Yet, under Prong A of the ABC Test, an individual is not properly classified as an independent contractor unless that person is "free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact." Cal. Labor Code § 2775(b)(1) (emphasis added).

As such, it is impossible for a franchisor to both "exert significant degree of control over the franchisee's method of operation, 16 C.F.R. § 436.1(h)(2), and leave franchisees "free from control and direction." Cal. Labor Code § 2775(b)(1). Simply put, any franchisor who meets the FTC Franchise Rule definition is an employee under the ABC Test, effectively convert all franchise relationships into employment relationships, stripping the FTC of its authority to regulate and safeguard the sale of franchises. *See, e.g.*, FTC, FRANCHISE RULE COMPLIANCE GUIDE, at p. 14 available at https://www.ftc.gov/system/files/documents/plain-language/bus70-franchise-rule-compliance-guide.pdf (listing employee-employer relationships as "excluded from" "franchise").

Further, application of the ABC Test to franchise relationships is preempted because it is in direct conflict with federal trademark law. The FTC Franchise Rule requires that a franchisee receive "the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods . . . that are identified or associated with the franchisor's trademark." 16 C.F.R. § 436.1. In turn, the Lanham Act, which is the federal law permitting the licensing of trademarks, requires that trademark licensors (i.e. the franchisors) control use of their

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

trademarks. *See* 15 U.S.C. §1127; *Barcamerica Int'l v. Tyfield Importers, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002) ("[w]here a licensor fails to exercise adequate quality control over a licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark"). Therefore, it is simply not possible to reconcile the federal obligation to maintain control over licensees with the ABC test's "free from control" requirement.

Observing such an "inherent conflict," the United States District Court for the District of Massachusetts recently ruled that the application of the Massachusetts ABC test to franchise relationships was preempted. *See Patel v. 7-Eleven, Inc.*, No. 1:17-cv-11414-NMG, 2020 WL 5440623, at \*6-10 (D. Mass. Sept. 10, 2020). Faced with the same "inherent conflict," the FTC Franchise Rule and Lanham Act should have a preemptive effect on the application of the ABC test to Plaintiffs.

# V.    **CONCLUSION**

For the foregoing reasons, summary judgment should be granted to Defendants.

DATED:  March 15, 2021                           OGLETREE, DEAKINS, NASH, SMOAK
                                                 & STEWART, P.C.


                                          By:  /s/ *Frank L. Tobin*
                                                 Frank L. Tobin
                                                 Kevin Hishta
                                                 Attorneys for Defendants FLOWERS
                                                 FOODS, INC., FLOWERS BAKING
                                                 CO. OF CALIFORNIA, LLC, and
                                                 FLOWERS BAKING CO. OF
                                                 HENDERSON, LLC

46370434.1

46370434_1.docx

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Notice of Electronic Filing.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 15, 2021.

By: */s/ Frank L. Tobin* _____
     Frank L. Tobin

46370434_1.docx

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT