1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SIMON GORO, an individual; TONY
RUSSELL, an individual; REY PENA, an
individual; JOSE PENA, an individual;
JEFF BELANDER, an individual; and
GUISEPPE ZIZZO, an individual,

Plaintiffs,

v.

FLOWERS FOODS, INC., a Georgia
corporation; FLOWERS BAKING CO.
OF CALIFORNIA, LLC, a California
limited liability company; FLOWERS
BAKING CO. OF HENDERSON, LLC, a
Nevada limited liability company; and
DOES 1 through 100, inclusive,

Defendants.

Case No.:  17-CV-2580 TWR (JLB)

**ORDER (1) GRANTING PLAINTIFF
TONY RUSSELL'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
ON DEFENDANTS' FIRST AND
THIRTY-SECOND AFFIRMATIVE
DEFENSES, AND (2) DENYING
WITHOUT PREJUDICE
PLAINTIFF'S MOTION TO SEAL**

(ECF Nos. 171, 172)

Presently before the Court is Plaintiff Tony Russell's Motion for Partial Summary
Judgment on Defendants' First and Thirty-Second Affirmative Defenses ("Mot.," ECF No.
171), as well as the Opposition filed by Defendants Flowers Foods, Inc. ("FF"); Flowers
Baking Co. of California, LLC ("FBC California"); and Flowers Baking Co. of Henderson,
LLC ("FBC Henderson") ("Opp'n," ECF No. 193) and Mr. Russell's Reply ("Reply," ECF

No. 195).  Also pending before the Court is Mr. Russell's Motion to Seal ("Mot. to Seal," ECF No. 172) certain exhibits filed in support of their Motion for Partial Summary Judgment.[1]  The Court held a hearing on September 9, 2021.  (*See* ECF No. 205.)  Having carefully considered the Parties' arguments and evidence and the law, the Court **DENIES WITHOUT PREJUDICE** Mr. Russell's Motion to Seal and **GRANTS** Mr. Russell's Motion for Partial Summary Judgment.

**BACKGROUND**

**I.  Material Facts[2]**

**A.  Defendants' Direct-Store-Delivery System**

FF is the second largest producer and marketer of bakery products in the United States.  (*See* ECF No. 171-3 ("Ex. A") at 2, 4.)  FF markets well-recognized brands such as Nature's Own, Dave's Killer Bread, and Wonder.  (*See id.*)  In 2017, FF had $3.9 billion in sales.  (*See id.* at 4.)  FF advertises to potential investors that it is in the "[r]etail and foodservice" market.  (*See id.*)

FF distributes its products through two segments: a Direct-Store-Delivery ("DSD") for fresh bakery foods and a Warehouse Delivery segment for others, including snack cakes and frozen products.  (*See id.* at 2, 5; *see also* ECF No. 171-4 ("Ex. B") at 41–42.)  The DSD segment accounts for approximately 85 percent of FF's sales, or approximately $3.3

---

[1] While Defendants' Motion for Partial Summary Judgment (*see generally* ECF No. 182), and Plaintiffs' related motion to file documents under seal, (*see generally* ECF No. 191), are also pending before the Court, those motions are set to be heard on November 3, 2021.  (*See generally* ECF No. 203.)

[2] As the Court reminded the Parties at the September 9, 2021 hearing, pursuant to the undersigned's Standing Order for Civil Cases, "[t]he parties must meet and confer . . . to arrive at a joint statement of undisputed material facts, which must be filed no later than the reply brief."  Standing Order for Civil Cases III.B.6.  No such statement was filed here because Mr. Russell's counsel "conferred with Defendants to arrive at a joint statement of undisputed material facts, but the parties could not agree on how that joint statement would read."  (*See* Reply at 10 n.10.)  The Court reminds the Parties that future failures to abide by the undersigned's Standing Order for Civil Cases may result in the imposition of sanctions.  *See, e.g.*, *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1125 n.1 (S.D. Cal. 2020) (warning where violations of the Local Rules and the court's standing order did not "facilitate[] an efficient review of" cross-motions for summary judgment that "[a]ny further failure to comply . . . may result in sanctions" (citing Civ.L.R. 83.1)).

billion in Fiscal Year 2017.  (*See* Ex. A at 2, 4–5.)  Under the DSD system, Defendants manufacture products and Distributors,[3] like Mr. Russell, deliver them.  (*See id.* at 2, 5; *see also* ECF No. 193-1 ("Parmer Decl.") ¶ 4.)  Internally, Defendants acknowledge that "[t]he primary purpose for operating under this model is reduced costs[, s]pecifically, . . . fringe benefits that would be paid to employees of the company versus those costs which become the responsibility of the [Distributor]" and "savings from the maintenance and use of the route vehicles (fuel, etc.)."  (*See* ECF No. 173-4 ("Ex. I") at 1.)

Publicly, Defendants characterize their use of Distributors as an "independent contractor franchise model," which is meant to incentivize Distributors to develop business and generate additional sales within the area to which they own distribution rights.  (*See* Ex. A at 5; *see also* Parmer Decl. ¶ 4.)  Under certain circumstances, Defendants may manage some routes using their employees.  (*See* Ex. I at 1.)  Other bakeries also use this distribution model, which was developed in the 1950s.  (*See* Parmer Decl. ¶ 4.)  Mr. Russell initially believed that, as a Distributor, he would have the opportunity to increase the value of his territory.  (*See* ECF No. 193-3 ("Ex. 1") at 36:14–17.)

To purchase distribution rights to a defined geographic territory, a Distributor signs a Distributor Agreement ("DA").  (*See* Parmer Decl. ¶ 8; *see also* Ex. I at 1; ECF No. 137-7 ("Ex. L") (DA between FBC Henderson and Mr. Russell).)  Although prospective Distributors may make certain elections under the DA, they are not permitted to make any changes to it.  (*See* ECF No. 173-14 ("Ex. Y") at 160:15–161:20.)  The DA defines the territory that the Distributor may purchase, the products the Distributor is authorized to sell, and the purchase price for those products.  (*See* Parmer Decl. ¶ 9.)  Under the terms of the DA, the Distributor is "an independent contractor" that "shall not be controlled by [Defendants] as to the specific details or manner of DISTRIBUTOR's business."  (*See id.* (quoting Pl.'s Ex. L "Witnesseth" Section ¶¶ 4, 16.1).)  Mr. Russell, for example, testified

---

[3] Although Defendants use the term "independent distributor" in Parmer Declaration and many of their other documents, the independence of these distributors is one of the main points of contention in this case.  The Court therefore refers to them as "Distributors" throughout.

17-CV-2580 TWR (JLB)

that he "vaguely understood" that he was entering into an independent contractor relationship with FBC Henderson. (*See* Ex. 1 at 39:5–17.)

Among other things, the DA also provides that Distributors: may hire others to operate their territory without Defendants' approval,[4] (*see* Parmer Decl. ¶¶ 10(a), 12(a)); may hold other jobs and deliver products for other companies, (*see id.* ¶ 10(b); *see also* Ex. 1 at 147:19–149:24); may sell products not from Defendants, so long as those products do not compete with Defendants' products, (*see* Parmer Decl. ¶ 10(c)); are not required to abide by a dress code, (*see id.* ¶ 10(d)); are expected to provide their own delivery vehicles, (*see id.* ¶ 10(e); *see also* Ex. 1 at 139:16–25); agree to use "commercially reasonable best efforts," (*see* Parmer Decl. ¶ 10(f)); are expected to perform in accordance with "Good Industry Practice," (*see id.* ¶ 10(g)); and own the distribution rights to Defendants' products in the Distributors' territory. (*See id.* ¶ 10(h).)  The term "Good Industry Practice" refers to industry customs, which the DA defines as "the standards that have developed and are generally accepted and followed in the baking industry," including "adequate fresh supply" of products, "properly rotating" products, and "promptly removing" stale products. (*See id.* ¶ 11; *see also* Ex. Y at 142:20–144:18.)  Defendants will repurchase stale product from Distributors up to a "stale cap" or "stale allowance." (*See* Parmer Decl. ¶ 20.)  As for sales products above the allowance, Distributors may sell them for non-human consumption, donate them to charity, or bear their cost as a business expense. (*See id.*)  The DA, however, explicitly proscribes Distributors from reselling stale product for human consumption to protect Defendants' brands. (*See id.*)

Defendants contend that, under the DA, Distributors are responsible for operating their own businesses. (*See id.* ¶ 12.)  According to Defendants, Distributors can decide: how many days a week to work given assistance from hired help, (*see id.* ¶ 12(a)); when

---

[4] Although Mr. Russell did not hire others to operate his territory, he did receive assistance on some Saturdays and some weekdays over the summer from his two teenaged sons "to teach [his] kids responsibility." (*See* Ex. 1 at 64:23–68:11, 71:12–73:3.)  Mr. Russell testified that he was required to obtain the warehouse manager's approval for his sons to enter the warehouse. (*See id.* at 76:9–77:4.)

to start and stop working each day, (*see id.* ¶¶ 12(b), (f); *see also* Ex. 1 at 310:7–311:2); the route taken to service their customers, (*see* Parmer Decl. ¶ 12(c)); how much time to spend at each retail location, (*see id.* ¶ 12(d)); whether and when to take breaks, (*see id.* ¶ 12(e)); what vehicle(s) are needed, (*see id.* ¶ 12(g)); what products to order for their customers, (*see id.* ¶ 12(h)); and, in consultation with their customers, the number of service days required.  (*See id.* ¶ 12(i); *but cf.* ECF No. 173-19 ("Ex. DD") at 191:7–193:23 (Mr. Russell explaining that he works seven days per week and sometimes all day because of customer requirements).)  Under this arrangement, Distributors are also responsible for their other business needs, such as insurance, hiring an accountant, etc.  (*See* Parmer Decl. ¶ 12(j).)  If a Distributor is unable to operate their territory on a particular day, Defendants may use an employee to cover the route and charge the Distributor for the necessary expenses.  (*See* ECF No. 173-21 ("Ex. JJ") at 249:15–250:11, 6–7; ECF No. 171-45 ("Thorndike Decl.") ¶¶ 3–5.)

Distributors sell products they purportedly purchase from Defendants to their customers, and may promote displays, solicit new accounts, recommend new products, and change product pricing, among other things.  (*See* Parmer Decl. ¶ 13.)  Distributors may personally service two types of accounts: cash accounts and unauthorized credit accounts.  (*See id.* ¶ 14.)  With cash accounts, the Distributor serves as the primary contact for the customer, accepting payment directly.  (*See id.*)  Accordingly, the Distributor may extend credit and set payment terms, but is also bears the risk of non-payment.  (*See id.*)  With charge accounts, the Distributor receives credit for their sales following sales transactions at their respective accounts.  (*See id.*)  Distributors receive from Defendants approximately 18 percent on average of the Manufacturer's Suggested Retail Price of the products they deliver, which represents their profit (or "margin") on the products they sell.  (*See* ECF No. 173-8 ("Ex. M") at 3; *see also* ECF No. 173-16 ("Ex. AA") at 82:15–83:25.)

Defendants employ national account representatives to serve as points of contact at the corporate level for larger chain accounts, such as Wal-Mart.  (*See id.* ¶ 15; *see also* ECF No. 173-3 ("Ex. H") (Wal-Mart "Supplier Agreement" with "Flowers Bakeries LLC");

ECF No. 173-5 ("Ex. K") (Sonic Industries Services Inc. and Sonic Capital LLC "Product Agreement" with "Flowers Foods Foodservice Sales, LLC").)   Defendants' top 25 customers account for approximately three-quarters of their revenue, (*see* ECF No. 173-5 ("Ex. J") at 3), and those customers decide on the products they will stock, the price to be paid, and the shelf allocation.  (*See* Parmer Decl. ¶ 15; *see also* ECF No. 173-9 ("Ex. N") at 10 ("The [Distributor] does not set prices, incentives, or advertising with the reseller."), 11–12 (same).)  Distributors are responsible, however, for establishing a relationship with local store management, who have significant discretion to award opportunities to Distributors.  (*See* Parmer Decl. ¶ 15.)  Some customers may impose their own "service requirements," including the hours during which they will accept deliveries, the number of delivery days per week, and/or standards for appearance, but Defendants contend that Distributors may negotiate with their customers regarding these requirements.  (*See id.* ¶ 18; *see also* ECF No. 171-9 ("Ex. G") (Walmart's "DSD Supplier Expectations"); ECF No. 171-18 ("Ex. P") (Albertsons/Vons/Pavilions' "Vendor Code of Conduct"); ECF No. 171-19 ("Ex. Q") ("Kroger Enterprise Vendor Dress and Conduct Policy"); ECF No. 171-20 ("Ex. R") (Olive Garden's "Service Procedures").)

Until the beginning of 2018, Defendants employed "Branch Sales Managers" ("BSMs") as advisors or liaisons to their Distributors.  (*See* Parmer Decl. ¶ 21.)  According to Defendants, BSMs did not "manage" Distributors, but instead were intended to help Distributors grow their businesses and sales by offering suggestions that Distributors could implement or not.  (*See id.*; *see also* ECF No. 193-4 ("Ex. 2") at 232:12–14.)  Although BSMs did visit retailers, Defendants contend that they did so to "look for opportunities to grow the business," not to supervise or check in on Distributors.  (*See* Parmer Decl. ¶ 22.)  Nonetheless, store visits did sometimes alert BSMs that Distributors were not complying with their contractual obligations under their DAs, (*see id.*), and, if a BSM noticed during a store visit that a Distributor was missing sales opportunities, the BSM might have approached the Distributor to discuss the issue.  (Ex. 2 at 164:18–24.)

/ / /

Although Defendants attempt to disclaim the written job descriptions for BSMs and Directors of Sales, (*see* Ex. 2 at 229:3–21, 231:9–234:9, 235:17–19, 236:4–16), a job description for Sales Managers advertised that they would "monitor[] and assist[] in the daily route sales operations of a branch of plant market, in a manner that results in maximum profitable sales, controlled stales, low turnover, superior customer relations, brand growth, proper accounts receivable record, proper distribution, positive relations with employees and independent distributors, and compliance with company policies/procedures and the distributor's agreement."  (*See* ECF No. 173-1 ("Ex. D") at 1.) The advertised responsibilities included "[t]rain[ing], assist[ing], and guid[ing] company sales employees and Independent Distributors in the proper distribution of Flowers Products;" "[c]ommunicat[ing] with, guid[ing] and direct[ing] each sales team member (Company and Distributor) in their efforts to attain/maintain positive customer relations, sales and stales goals, and compliance with company policies/procedures and the Distributor's agreement;" "[e]nsur[ing] . . . contact with all . . . distributors at least twice weekly;" and "[e]nsur[ing] Sales Representatives and Distributors have the tools necessary to do their jobs to Flowers or industry standards."  (*See id.* at 1–2; *see also* Ex. Y at 51:10–56:5 (discussing training programs); ECF No. 173-17 ("Ex. BB") at 140:1–143:11 (discussing work performed in the territories); ECF No. 173-18 ("Ex. CC") at 30:13–31:16 (same).)  Similarly, the job description for the director of sales summarizes the position as entailing "[d]irect the management of the sales of Flowers products in assigned branches." (*See* ECF No. 171-5 ("Ex. C") at 2.)  Territory Operations Specialists are advertised as "further develop[ing] and execut[ing] orientation, mentoring, and educational opportunities [for] . . . Distributors."  (*See* ECF No. 173-2 ("Ex F") at 1; *see also id.* ("Develop and implement mentoring and educational opportunities for IDs[.]").)

When Defendants determine that a Distributor is violating their contractual obligations under the DA, including failing to satisfy the "Good Industry Practice" standard, Defendants may issue a "breach letter" as provided in the DA.  (*See* Parmer Decl. ¶¶ 23–24; *see also* ECF No. 173-12 ("Ex. W"); ECF No. 173-13 ("Ex. X").)  Breach letters

are most commonly issued in response to customer complaints.  (*See* Parmer Decl. ¶ 23.)  Whether to issue a breach letter depends on an individualized assessment and is subject to review and challenge by the Distributor.  (*See id.*)  Breach letters serve the dual purpose of informing Distributors of personal risks to their business and protecting Defendants' brands and distributor network.  (*See id.* ¶ 24.)  Breach letters are typically "curable," meaning the Distributor is given an opportunity to remedy the breach within a specific timeframe.  (*See id.* ¶ 25.)  In limited circumstances, however, such as those involving criminal activity, violations of the law, or "substantial harm" to Defendants' brands and ability to service customers, breach letters may be non-curable.  (*See id.*)

Defendants' DSD system has been the subject of much investigation and litigation.  (*See, e.g.*, Ex. B at 41; ECF No. 197-7.)  For example, the California Labor Commissioner determined on December 20, 2017, that a Distributor who filed a claim for reimbursable business expenses against FBC Henderson was a "franchisee and therefore outside of the Labor Commission jurisdiction."  (*See generally* ECF No. 197-7.)  Around the same time, the United States Department of Labor conducted investigations of Defendants in three counties of Georgia, concluding that Defendants had misclassified their Distributors as independent contractors rather than employees.  (*See generally* ECF No.171-36 ("Ex. HH").)  Defendants have also been named in several employment actions across the country.  (*See, e.g.*, ECF No. 171-41 ("Ex. MM"); *see also* ECF No. 195-1 ("Ex. QQ") at 17, F-53.)

## B.    Defendants' Accounting Practices

As a publicly traded company, FF must regularly file reports with the Securities and Exchange Commission ("SEC").[5]  (*See* ECF No. 173-20 ("Ex. EE") at 11:21–13:15.)  FF's

/ / /

---

[5] Because judicial notice of SEC filings is proper under Federal Rule of Evidence 201, *see, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (citing *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006)), the Court **GRANTS** Mr. Russell's requests that the Court take judicial notice of FF's SEC filings, Exhibits B, V, FF, and QQ.  (*See* ECF Nos. 171-46, 195-2.)

SEC filings repeatedly describe distributors as independent businesses.  (*See* ECF No. 193-5 ("Davis Decl.") ¶ 4.)  FF's financial reporting is also based on this premise.  (*See id.*)

Based on guidance from the Financial Accounting Standards Board ("FASB"), FF recognizes revenue for authorized charge sales when the product is delivered to retailers by Distributors and for scan-based trading accounts when the product is purchased by the end consumer.  (*See id.* ¶ 6; *see also* Ex. B at 9; Ex. I at 2.)  When a Distributor picks up more product than is required to service their authorized charge or pay-by-scan sales, such as for unauthorized charge or cash sales, FF recognizes revenue immediately.  (*See* Ex. I at 4.)  Both PricewaterhouseCoopers ("PwC"), which is FF's outside auditor, (*see* Davis Decl. ¶ 1), and Ernst & Young approve of FF's manner of revenue recognition.  (*See id.* ¶ 7.)  Under Generally Accepted Accounting Principles ("GAAP"), intercompany transactions—including those between FF's subsidiaries—are reflected only by offsetting ledger entries that do not appear in the consolidated financial statements, which reflect only transactions with outside parties.  (*See id.* ¶ 8; *see also* Ex. I at 2.)  Under GAAP, these offsetting ledger entries reflect bona fide transactions.  (*See* Davis Decl. ¶ 8.)

In internal memoranda regarding revenue recognition in transactions involving Distributors, FF's accounting personnel have concluded that Distributors are "agents" of Defendants for authorized charge and pay-by-scan sales for purposes of reporting revenue at gross or net.  (*See* Ex I at 4–5; Ex. N at 9–12; Ex. EE at 18:5–19:3, 38:13–41:3.)  These sales are also "considered to be consignment arrangements because control does not transfer to the [Distributor]."  (*See* Ex. N at 22.)  In other words, for authorized charge and pay-by-scan sales, Defendants recognize the reseller as their customer and the Distributor as an intermediary.  (*See id.* at 5.)  Ultimately, for these two transaction types—which account for 90 to 95 percent of FF's sales—it is Defendants who have promised to deliver product to resellers with whom they contract, and Defendants "have engaged the [Distributor] to fulfill this promise."  (*See id.* at 7, 9; Ex. EE at 34:24–37:7; *see also* ECF No. 173-10 ("Ex. O") at 7 ("Independent distributors facilitate the sale[s brokered by

/ / /

Defendants] by picking up the product at Flowers' warehouse and delivering to the customer.").)

## II.   Relevant Procedural Background

Plaintiffs Simon Goro, Mr. Russell, Rey Pena, Jose Pena, Jeff Belander, and Giuseppe Zizzo initiated this action in the Superior Court of California, County of San Diego, on November 27, 2017.  (*See generally* ECF No. 1-2.)  Generally alleging that Defendants had misclassified them as independent contractors rather than employees, Plaintiffs asserted claims for (1) failure to compensate for all hours worked; (2) failure to pay overtime premium pay; (3) waiting-time penalties; (4) failure to provide accurate wage statements; (5) failure to provide meal periods; (6) unlawful deductions from wages; (7) failure to indemnify for necessary expenditures; and (8) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  (*See generally id.*)  After answering Plaintiffs' complaint and asserting thirty-three affirmative defenses on December 26, 2017, (*see generally* ECF No. 1-3), Defendants removed to this Court based on diversity jurisdiction on December 28, 2017.  (*See generally* ECF No. 1.)

On March 22, 2018, Plaintiffs filed their first amended complaint, adding a ninth claim for enforcement of the California Private Attorney General Act ("PAGA"), Cal. Labor Code §§ 2698 *et seq.*  (*See generally* ECF No. 17.)  Defendants moved to dismiss Plaintiffs' PAGA cause of action on April 12, 2018, (*see* ECF No. 22), and also filed an answer to Plaintiffs' first amended complaint, asserting thirty-two affirmative defenses. (*See generally* ECF No. 23.)  While their motion to dismiss was still pending, the Parties filed cross-motions for partial summary judgment on November 16, 2018.  (*See generally* ECF Nos. 78, 81.)  On January 8, 2019, the Honorable Janis L. Sammartino granted Defendants' motion to dismiss Plaintiffs' PAGA cause of action and denied as moot the pending motions for partial summary judgment.  (*See generally* ECF No. 92.)

Plaintiffs filed their operative Second Amended Complaint on January 15, 2019, adding additional allegations to support their PAGA cause of action.  (*See generally* ECF
/ / /

No. 95.)  On January 29, 2019, Defendants answered, again asserting thirty-two affirmative defenses.  (*See generally* ECF No. 98.)

Mr. Russell moved for partial summary judgment as to Defendants' first affirmative defense—i.e., that Defendants were never Plaintiffs' employers—on February 15, 2019. (*See generally* ECF No. 99.)  Defendants filed their own motion for partial summary judgment as to six of Plaintiffs' causes of action on March 12, 2019.  (*See generally* ECF No. 104.)  After Judge Sammartino took the cross-motions for partial summary judgment under submission, (*see generally* ECF No. 135), Defendants moved to stay this action pending resolution of the following issues: (1) whether the "ABC" test articulated in *Dynamex Operations West v. Superior Court*, 4 Cal. 5th 903 (2018), applies retroactively; and (2) whether the Federal Aviation and Administration Authorization Act ("F4A") preempts prong "B" of the ABC test.  (*See generally* ECF No. 141.)  On January 24, 2020, Judge Sammartino stayed this action pending the California Supreme Court's in *Vazquez v. Jan-Pro Franchising International, Inc.*, No. S258191 (Cal. filed Sept. 26, 2019), and denied without prejudice the Parties' cross-motions for partial summary judgment.  (*See generally* ECF No. 166.)

On September 25, 2020, this action was transferred to the undersigned.  (*See generally* ECF No. 167.)  After Plaintiffs informed the Court that the California Supreme Court had issued a decision in *Vazquez*, (*see generally* ECF No. 168), the Court lifted the stay, (*see generally* ECF No. 169), and requested a Joint Status Report from the Parties. (*See generally* ECF No. 170.)  Before the ordered deadline for the Joint States Report, Mr. Russell filed the instant Motions.  (*See generally* ECF Nos. 171, 172.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Although materiality is

determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *see also Anderson*, 477 U.S. at 248. Accordingly, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 256.

/ / /

/ / /

12

# ANALYSIS[6]

Through the instant Motion, Mr. Russell seeks summary adjudication in his favor as to Defendants' first and thirty-second affirmative defenses. (*See* Mot. at 2; ECF Nos. 171-1 & 173-23 ("Mem.") at 1, 25; *see also generally* Mem. at 9–25.[7]) Defendants' first affirmative defense provides that "Plaintiffs' claims may not be properly maintained against Defendants because Defendants were never Plaintiffs' employer, joint employer, or co-employer," (Ans. at 13), while their thirty-second affirmative defense maintains that "Plaintiffs' claims are preempted, in whole or in part, by the Federal Aviation Administration Authorization Act." (*Id.* at 18.)

In evaluating Mr. Russell's Motion, the Court first determines whether the ABC Test articulated by the California Supreme Court in *Dynamex*, 4 Cal. 5th 903, and codified at California Labor Code section 2775, or the alternate test under *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989) (the "*Borello* test") applies to Mr. Russell's claims. The Court then addresses Defendants' preemption arguments concerning the ABC Test, including the viability of Defendants' thirty-second affirmative defense. Finally, the Court proceeds to evaluate Defendants' first affirmative defense.

## I.   ABC Test or *Borello* Test

As an initial matter, the Court must determine whether the ABC Test or the *Borello* test applies to Mr. Russell's employment law claims. Mr. Russell contends that the ABC Test applies to all his claims, (*see* Mem. at 14–17), while Defendants contend that his

---

[6] Defendants seek to incorporate by reference their previously filed evidentiary objections. (*See* Opp'n at 3 n.2 (citing ECF No. 111-6).) As Mr. Russell notes, (*see* Reply at 1 n.1), the undersigned's Standing Order for Civil Cases provides that "[o]bjections to evidence submitted in support of a motion must be contained within the opposition brief, and . . . [n]o separate statements of objections will be allowed." Standing Order for Civil Cases § III.B.4. The Court therefore disregards Defendants' prior evidentiary objections. *See, e.g.*, *Anhing Corp. v. Thuan Phong Co.*, 215 F. Supp. 3d 919, 929 (C.D. Cal. 2015); *Miller v. City of Los Angeles*, No. CV 13-5148-GW(CWX), 2015 WL 12811238, at *23 (C.D. Cal. Oct. 22, 2015).

[7] A public, redacted version of Mr. Russell's memorandum of points and authorities was filed at ECF No. 171-1, while an unredacted, sealed version of Mr. Russell's memorandum was filed as ECF No. 173-23.

17-CV-2580 TWR (JLB)

claims for expense reimbursement and waiting time penalties are governed by the *Borello* test.  (*See* Opp'n at 11–12.)

The Court first addresses Defendants' retroactivity argument.  (*See id.* at 11.)  In *Vazquez*, the California Supreme Court clarified that the ABC Test articulated in "*Dynamex* applies retroactively to all nonfinal cases [governed by wage orders] that predate the effective date of the *Dynamex* decision."  *See* 10 Cal. 5th at 958.  Nonetheless, Defendants contend, based on *Haitayan v. 7-Eleven, Inc.*, No. CV 17-7454 DSF (ASx), 2021 WL 757024 (C.D. Cal. Feb. 8, 2021), and *Olson v. California*, No. CV1910956DMGRAOX, 2020 WL 905572, at *12 (C.D. Cal. Feb. 10, 2020), that Assembly Bill 5, later codified as Section 2775 of the California Labor Code, does not apply retroactively.  (*See* Opp'n at 11.)  But Defendants' cases, *see Haitayan*, 2021 WL 757024, at *5; *Olson*, 2020 WL 905572, at *12, fail to address Section 2785(a) of the California Labor Code, which provides that, as codified in Section 2775, the ABC Test "does not constitute a change in, but is declaratory of, existing law with regard to wage orders of the Industrial Welfare Commission [("IWC")] and violations of th[e Labor C]ode relating to wage orders."[8]  "[W]here a statute provides that it clarifies or declares existing law, '[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment."  *W. Sec. Bank v. Super. Ct.*, 15 Cal. 4th 232, 244–45 (1997) (second alteration in original) (quoting *Cal. Emp. Stabilization Comm'n v. Payne*, 31 Cal. 2d 210, 214 (1947)) (citing *City of Sacramento v. Public Emps.' Retirement Sys.*, (1994) 22 Cal. App. 4th 786, 798 (1994); *City of Redlands v. Sorensen*, 176 Cal. App. 3d 202, 211 (1985)).  Because Mr. Russell's claims were pending before April 30, 2018 (the date of the *Dynamex* decision), and September 4, 2020 (the effective date of Section 2785), the ABC Test applies so long

/ / /

---

[8] "In California, wage orders are constitutionally-authorized, quasi-legislative regulations that have the force of law."  *Dynamex*, 4 Cal. 5th at 914 n.3 (citing Cal. Const., art. XIV, § 1; Cal. Lab. Code, §§ 1173, 1178, 1178.5, 1182, 1185; *Indus. Welfare Comm'n. v. Super. Ct.*, 27 Cal. 3d 690, 700-703 (1980)).

as Mr. Russell's claims for expense reimbursement and waiting time penalties "relat[e] to wage orders."

According to Mr. Russell, his seventh cause of action for failure to indemnify for necessary expenditures, (*see* SAC ¶¶ 52–55), relates California Labor Code section 2802 and Wage Order 1(8) and (9),[9] (*see* Mem. at 16), while his third cause of action for waiting-time penalties, (*see* SAC ¶¶ 36–39), is "derivative" of their other claims under the California Labor Code and IWC wage orders.  (*See* Mem. at 16 n.9.)  Mr. Russell cites the California Court of Appeal's decision in *Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131 (2019), in which the court concluded that the plaintiff's claims for "failure to reimburse expenses and improper deductions in violation of section 2802 [are] encompassed by Wage Order No. 9(8) and (9)."  *See id.* at 1157; *see also* ECF No. 171-23

---

[9] In relevant part, these provisions provide:

**8.    Cash Shortage and Breakage**

No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

**9.    Uniforms and Equipment**

(A)    When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer.  The term "uniform" includes wearing apparel and accessories of distinctive design or color.

. . .

(B)    When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

Cal. Code Regs. tit. 8, § 11010(8), (9)(A)–(B).

("Ex. U"), *also available at Johnson v. VCG-IS, LLC*, No. 30201500802813CUCRCX, 2018 WL 3953771 (Cal. Super. July 18, 2018) (unpublished minute order concluding that waiting time claims under Section 201 to 203 and reimbursement claims under 2802 are covered by wage orders).  In their briefing, Defendants rely solely on the fact Mr. Russell's expense reimbursement and waiting time penalty claims arose before January 1, 2020, declining to address whether those claims relate to wage orders.  (*See* Opp'n at 11–12 (citing *Moreno v. JCT Logistics, Inc.*, No. EDCV 17-2489 JGB (KKx), 2019 WL 3858999, at *1, *12 (C.D. Cal. May 29, 2019); *Alvarez v. XPO Logistics Cartage LLC*, No. 18-cv-03736 SJO (E), 2018 WL 6271965, at *2, *4 (C.D. Cal. Nov. 15, 2018); *Garcia v. Border Transp. Grp., LLC*, 28 Cal. App. 5th 558, 571–72 (2018)).)  Further, the cases on which Defendants rely fail meaningfully to address the relation of expense reimbursement claims and waiting time penalties to wage orders.  *See Moreno*, 2019 WL 3858999, at *1, *12 (concluding that the ABC Test applied to the plaintiff's rest break, meal break, and minimum wage claims and UCL claims based on those violations because the "[p]laintiff indicated [at the hearing] that [those same claims] depend on wage orders"); *Alvarez*, 2018 WL 6271965, at *2, *4 (applying ABC Test only to claims for failure to pay minimum wage, failure to pay wages for missed meal periods, and failure to pay wages for missed rest periods "because they are addressed to the same California wage orders at issue in *Dynamex*," without addressing claims for failure to reimburse business expenses or waiting time penalties); *Garcia*, 28 Cal. App. 5th at 571–72 (concluding, without analysis, that "the wage order does not encompass claims for . . . waiting time penalties").

The Court concludes that Mr. Russell's claims for expense reimbursement and waiting time penalties relate to wage orders such that the ABC Test applies to those claims. Mr. Russell urges that his waiting time claims relate to the work orders because they are derivative of his other labor-related claims.  (*See* Mem. at 16 n.9; *see also* SAC ¶ 37 (alleging that penalties are merited because of Defendants' failure to compensate Plaintiffs "for all hours worked, failing to adequately compensate for meal and rest breaks, [and] failing to pay overtime premium pay").)  Defendants' own cases support that the ABC Test

applies to a cause of action based on causes of action relating to wage orders.  *See, e.g.*, *Moreno*, 2019 WL 3858999, at \*12 (concluding that ABC Test applies to claims under California's UCL based on meal break, rest break, and minimum wage claims); *Garcia*, 28 Cal. App. 5th at 571–72 (same).  As for the waiting time penalties, Mr. Russell alleges that "Defendants unlawfully failed to indemnify Plaintiffs for reasonable and necessary expenditures, including their vehicles, tools, cellular telephones, transportation expenses, insurance, uniform and laundry of the same, loss of product (such as stolen baked goods), among other expenses."  (*See* SAC ¶ 54.)  As Mr. Russell notes, these allegations "relate" to Wage Order 1(9), which requires an employer to provide uniforms, Cal. Code Regs. tit. 8, § 11010(9)(A), and required or necessary tools or equipment.  Cal. Code Regs. tit. 8, § 11010(9)(B).  The Court therefore concludes that the ABC Test applies to Mr. Russell's claims.

## II.  Preemption Arguments

Defendants next contend that Mr. Russell cannot prevail under the ABC Test because it is preempted by the F4A, (*see* Opp'n at 3–9 (discussing Defendants' thirty-second affirmative defense)), and under the Federal Trade Commission Franchise Rule ("FTC Franchise Rule"), 16 C.F.R. §§ 436 *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*  (*See* Opp'n at 9–11.)

### A.  *Thirty-Second Affirmative Defense: F4A Preemption*

For their thirty-second affirmative defense, Defendants assert that "Plaintiffs' claims are preempted, in whole or in part, by the Federal Aviation Administration Authorization Act."  (*See* Ans. at 18.)  Mr. Russell raises several arguments against F4A preemption, (*see* Mem. at 17–24), and Defendants respond that his arguments were rejected in *California Trucking Association v. Becerra*, 433 F. Supp. 3d 1154 (S.D. Cal. 2020) (Benitez, J.), and "there is, at a minimum, a triable issue of fact given that Judge Benitez entered a state-wide order enjoining the enforcement of the ABC test as to motor carriers."  (*See* Opp'n at 9 (citing *Cal. Trucking Ass'n v. Becerra*, 433 F. Supp. 3d at 1171).)

/ / /

After Defendants filed their Opposition, however, the Ninth Circuit reversed *California Trucking Association v. Becerra*, concluding that "the F4A does not preempt [the ABC test] as applied to motor carriers," (Reply at 1–2 (alteration in original) (quoting *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 659 (9th Cir. 2021))), and reversing Judge Benitez's state-wide injunction.  *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d at 665–66. The California Trucking Association has requested review of the Ninth Circuit's decision, and Defendants attempt to argue that the "issue remains open." (*See* ECF No. 197 at 6.[10]) But "once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority[.]" *Yong v. I.N.S.*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000) (citing *McClellan v. Young*, 421 F.2d 690, 691 (6th Cir. 1970)). This is true even when, as here, *see* Order, *Cal. Trucking Ass'n v. Bonta*, No. 20-55106 (9th Cir. filed June 23, 2021), ECF No. 113, the Ninth Circuit has stayed the mandate to offer an opportunity to petition for review of the decision.  *See In re Zermeno-Gomez*, 868 F.3d 1048, 1050–53 (9th Cir. 2017) (concluding that district court committed clear error and ordering the district court to comply with a published decision issued by the Ninth Circuit despite the fact that the mandate had been stayed to allow the government to seek en banc review or to petition for a writ of certiorari).  Accordingly, the Court concludes that *California Trucking Association v. Bonta* is determinative, **GRANTS** Mr. Russell's Motion, and **DISMISSES** Defendants' thirty-second affirmative defense that the ABC Test is preempted by the F4A as to Mr. Russell.

---

[10] In support of their own affirmative motion for partial summary judgment—the only filing in which Defendants had the opportunity to address the Ninth Circuit's decision in *California Trucking Association v. Bonta*—Defendants invoke the First Circuit's decision in *Schwann v. FedEx Ground Package System, Inc.*, 813 F.3d 429 (1st Cir. 2016), to support their argument that, by precluding Defendants from using independent contractors, Prong B of the ABC test relates to the service of a motor carrier and therefore is expressly preempted by the F4A. (*See* ECF No. 197 at 6 (citing *Schwann*, 813 F.3d at 437).) But the Ninth Circuit rejected this argument in *California Trucking Association v. Bonta*, noting that it had "previously concluded that such indirect consequences have 'only a tenuous, remote, or peripheral connection to rates, routes or services.'" 996 F.3d at 663 (quoting *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 643 (9th Cir. 2014)).  This Court, therefore, must also reject Defendants' argument.

### *B.      Preemption Under the FTC Franchise Rule and the Lanham Act*

Before the Court may proceed to analyze Defendants' first affirmative defense, the Court also must address Defendants' additional preemption arguments, namely, that "applying the ABC Test is preempted by the Federal Trade Commission Franchise Rule and the Lanham Act" because Plaintiffs are franchisees. (*See* Opp'n at 9–11.) Specifically, Defendants argue, the FTC Franchise Rule requires a "franchisor . . . to exert a significant degree of control over the franchisee's method of Operation," (*see* Opp'n at 10 (quoting 16 C.F.R. § 436.1(h)(2))), and the Lanham Act requires franchisors to "control use of their trademarks," (*see id.* (citing 15 U.S.C. § 1127), requirements that "directly conflict with the ABC Test's 'free from control' requirement." (*See id.*)   Mr. Russell responds that "Flowers cannot meet its burden to demonstrate how the labor laws at issue stand as a significant obstacle to any objective Congress seeks to achieve" because neither the FTC Franchise Rule nor the Lanham Act evidences a clear and manifest intent to regulate wages or employment relationships between franchisors and franchisees.  (*See* Reply at 2–3.) Mr. Russell also argues that the Ninth Circuit implicitly rejected Defendants' arguments in *Vazquez*.  (*See* Reply at 3 (citing *Vazquez*, 986 F.3d at 1122).)

In *Vazquez*, the Ninth Circuit held that "the franchise context does not alter the *Dynamex* analysis."  *See* 986 F.3d at 1124.  Although highly persuasive, the Ninth Circuit in *Vazquez* was not confronted with the preemption arguments that are currently before the Court.  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field."  *CTIA - Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 849 (9th Cir. 2019).  Defendants appear to invoke conflict preemption.  (*See* Opp'n at 9–11 (arguing that it is "impossible to reconcile" the FTC Franchise Rule and Lanham Act with California's ABC Test).)  To determine whether the ABC Test conflicts with the FTC Franchise Rule and Lanham Act, the Court must focus on Congress's intent and "begin with the presumption that Congress did not intend to

preempt a law that is within a state's historical police powers, unless that 'was the clear and manifest purpose of Congress.'" *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d at 654 & 664 n.14 (quoting *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1021 (9th Cir. 2020)).  Labor law is traditionally an area of state concern.  *See, e.g.*, *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 675 (9th Cir. 2013).

First, Defendants fail to identify any actual conflict between the ABC Test and the FTC Franchise Rule or Lanham Act.  Not only do Defendants rely only on the definitional provisions of the FTC Franchise Rule and Lanham Act, (*see* Opp'n at 10 (citing 15 U.S.C. § 1127; 16 C.F.R. § 436.1(h)(2))), but they fail to identify a conflict between those definitions and the ABC Test.  The FTC Franchise Rule's definition for a "franchise" provides only that a "franchisor  . . . has authority to exert a significant degree of control over the franchisee's method of operation," *see* 16 C.F.R. § 436.1(h)(2), while the Lanham Act defines a "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."  15 U.S.C. § 1127.  The ABC Test, on the other hand, requires that an independent contractor be "free from control and direction of the hiring entity in connection with the performance of the work."  *See* Cal. Labor Code § 2775(b)(1)(A).  But that all three provisions include the term "control[]" does not mean that the provisions are related, much less that they conflict.  For example, the phrase "method of operation" in the FTC Franchise Rule is broader than the phrase "performance of . . . work" appearing in the ABC Test.  While a franchisor may dictate that a franchisee include certain food items on its menu, that does not mean that a franchisor must dictate the franchisee's hiring decisions, the layout of its kitchen, or the wages it pays its employees.  The same is true of the Lanham Act, which applies to a licensor's control over the "use of [its] mark," not the performance of work by its licensee.  Defendants therefore fail to identify any conflict between these federal authorities and California's ABC Test.

Second, neither the FTC Franchise Rule nor the Lanham Act evidences a "clear and manifest purpose of Congress" to preempt state labor law.  Rather, Part 436 of Title 16 of

the Code of Federal Regulations generally regulates Disclosure Requirements and Prohibitions Concerning Franchising. *See generally id.*; *see also* 16 C.F.R. §§ 1.8, 1.22 (indicating that Congress authorized the FTC to promulgate rules and regulations regarding unlawful trade practices). Similarly, the Lanham Act generally governs trademarks and unfair competition related to the misuse of registered marks. *See* 15 U.S.C. § 1127; *see also generally* 15 U.S.C. ch. 22. In short, Defendants fail to identify any specific provision of the FTC Franchise Rule or Lanham Act that evidences Congress's "clear and manifest" intent to preempt labor laws, much less those concerning the classification of workers as independent contractors or employees. Accordingly, the Court concludes that Defendants fail to establish that the ABC Test is preempted by either the FTC Franchise Rule or the Lanham Act.

Because Defendants have failed to demonstrate that the ABC Test is preempted by either the F4A, the FTC Franchise Rule, or the Lanham Act, the Court will apply the ABC Test to evaluate Defendants' first affirmative defense.

## III.   First Affirmative Defense: Employment Status

Defendants' first affirmative defense is that "Plaintiffs' claims may not be properly maintained against Defendants because Defendants were never Plaintiffs' employer, joint employer, or co-employer." (*See* Ans. at 13.) Mr. Russell contends that he is entitled to summary adjudication because Defendants are unable to meet their burden of raising a genuine issue of material fact as to his employment status under either the ABC Test or the alternate *Borello* test. (*See generally* Mem. at 9–14, 24–25.)

The Court has already determined that the ABC Test applies to Mr. Russell's claims. (*See supra* Sections I–II.) Pursuant to California's ABC Test,

[A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A)   The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

21

    (B)    The person performs work that is outside the usual course of the hiring entity's business.

    (C)    The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Lab. Code § 2775(b)(1).  Mr. Russell contends that he is entitled to summary adjudication because Defendants cannot raise a genuine dispute of material fact regarding the applicability of either of the first two prongs of the ABC Test.  Because the Court agrees that Defendants have failed to identify a genuine issue of material fact as to Prong B, the Court declines to analyze Prong A.  *See Vazquez*, 986 F.3d at 1125 ("[T]he ABC test is conjunctive, so a finding of any prong against the hiring entity directs a finding of an employer-employee relationship.").

       Prong B requires Defendants to establish that Mr. Russell "performs work that is outside the usual course of [Defendants'] business."  *See* Cal. Lab. Code § 2775(b)(1)(B). In other words, "Prong B requires the hiring entity to establish that it was not engaged in the same usual course of business as the putative employee."  *See Vazquez*, 986 F.3d at 1125.  According to the California Supreme Court, this requirement is meant "to bring within the 'employee' category *all* individuals who can reasonably be viewed as working '*in the [hiring entity's] business*[.]'"  *Dynamex*, 4 Cal. 5th at 959 (emphasis and first alteration in original) (quoting *Martinez v. Combs*, 49 Cal. 4th 35, 69 (2010)).  The Ninth Circuit has advised that "courts have framed the Prong B inquiry in several ways." *Vazquez*, 986 F.3d at 1125.  For example, courts "have considered whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in."  *See id.* (citing *Mattatuck Museum-Mattatuck Historical Soc'y v. Adm'r, Unemployment Comp. Act*, 238 Conn. 273, 279 (1996); *Carey v. Gatehouse Media Mass. I, Inc.*, 92 Mass. App. Ct. 801, 804–10 (2018)).  "All of these / / /

formulations should be considered in determining whether" a hiring entity is an employer under Prong B.  *See id.*

Defendants contend that there are factual disputes related to the first and third factors under Prong B that prevent summary adjudication, and that there also exist factual disputes about the relationship between Mr. Russell and FF.  (*See* Opp'n at 13–14.)  With regard to the first factor, Defendants argue that Mr. Russell's own Memorandum reveals his belief that Defendants are in the "baking business," while he is in the transportation or delivery business.  (*See id.* at 14 (citing Mem. at 1, 5, 10, 11, 21, 22).)  According to Defendants, "[i]f Russell could conclude that he is in the transportation business and Defendants are in the baking business, a juror could do the same."  (*See id.* (citing Parmer Decl. ¶ 12(a)).)  The Court finds this argument disingenuous—while Mr. Russell may concede that Defendants manufacture baked goods, he also contends that Defendants' business is not so limited, additionally encompassing sales, delivery, and merchandising.  (*See* Mem. at 10–12.)

Defendants also argue that they are "indifferent to how much work Distributors do . . . and how they perform their work."  (*See* Opp'n at 15 (citing Parmer Decl. ¶ 12(a)).)  The Court agrees that Defendants "misrepresent Mr. Parmer's declaration to make this claim."  (*See* Reply at 4.)  Paragraph 12(a) of the Parmer Declaration provides only that "Mr. Russell could exercise his rights under the DA to hire others to distribute products for him, without prior approval from Flowers.  As a result, Mr. Russell could work five days a week, or two days, or no days.  It was all up to him."  (Parmer Decl. ¶ 12(a).)  Even if true, this does not support that Defendants were "indifferent" to the amount or end results of their Distributors' labor.  Indeed, Mr. Russell responds that this argument is "absurd" because "most Flowers' business flows through its DSD segment . . . ; Flowers contractually promises that it will put its products on large retail shelves and service these retail customers . . . ; Flowers can and will discipline distributors for not meeting performance obligations it owes to its customers . . . ; Flowers personally operates territories and carries out the same work as distributors . . . ; and Flowers operates

17-CV-2580 TWR (JLB)

distributors' territories where they fail to do so in order to keep the sales flowing." (*See* Reply at 4–5 (citations omitted).)

The Court agrees that the undisputed facts demonstrate that Distributors' work was necessary to Defendants' business.  Defendants' DSD segment accounted for 85 percent of their sales for Fiscal Year 2017, or approximately $3.3 billion of $3.9 billion in total sales over that period.  (*See* Ex. A at 1.)  In their "Investor Fact Sheet," Defendants identified their "distributor partners" as part of their "**core business**." (*See id.* at 4 (emphasis in original).) Defendants' top 25 customers account for approximately three-quarters of their revenue, (*see* Ex. J at 3), and it is Defendants that negotiate and sign contracts with these large chain accounts.  (*See* Parmer Decl. ¶ 15; Ex. H (Wal-Mart "Supplier Agreement" with "Flowers Bakeries LLC"); Ex. K (Sonic Industries Services Inc. and Sonic Capital LLC "Product Agreement" with "Flowers Foods Foodservice Sales, LLC").)  These large customers decide the products they will stock, the price they will pay, and the shelf space they will allocate. (*See* Parmer Decl. ¶ 15; *see also* Ex. N at 10 (internal accounting memorandum recognizing that "[t]he [Distributor] does not set prices, incentives, or advertising with the reseller" for pay-by-scan transactions), 11–12 (same for authorized credit transactions).)  It is Defendants who contract to sell and deliver their products to these customers, (*see, e.g.*, Ex. H at 1; Ex. K at 8), who therefore view Defendants, not their Distributors, as their "vendor." (*See* Ex. N. at 9, 11.)  Consequently, when Distributors fail to perform under Defendants' contracts, Defendants may use their own employees to fulfill those duties,[11] (*see, e.g.*, Ex. JJ at 249:14–250:13; Ex. JJ at 8), and may even terminate a Distributor within 24-hours if their "failure of performance . . . threatens to do substantial harm to COMPANY's business, trademarks or reputation, including, but not limited to, any action or inaction on DISTRIBUTOR's part that results in DISTRIBUTOR's inability to service any Chain account." (*See* Ex. L § 17.3; *see also*

---

[11] FF's 2016 Form 10-K filed with the SEC also indicates that FF owns "230 company owned and operated territories with the distribution rights that are not available for sale." (*See* Ex. QQ at 1.)

Parmer Decl. ¶ 5 ("To the extent that an Independent Distributor does not deliver products in a timely and professional manner including selling stale product to consumers or causing accounts to use other vendors it is harmful to both Flowers and the distributor network.").) These undisputed facts establish that the Distributors' work was necessary, and not merely incidental to, to Defendants' business. (*See* Ex. QQ at 12 ("Our ability to make, move and sell products is critical to our success.").)

As for the third factor, Defendants contend that they "make clear that they manufacture products and use independent Distributors to deliver them." (*See* Opp'n at 17.) Defendants also identify three exhibits Mr. Russell filed that "state that Defendants are not in the delivery business." (*See id.* (citing Exs. A, B, V).) A review of these exhibits, however, reveals that Defendants hold themselves out as more than a mere manufacturer of baked goods. Exhibit A, for example, is a printout from the "Flowers Foods At-A-Glance" tab of FF's website. (*See* Ex. A at 2–3.) On that page, FF advertises that it "produces and markets bakery products in the United States," and that "[i]t operates through two segments, Direct-Store-Delivery (DSD) and Warehouse Delivery." (*See id.* at 2; *see also* Ex. QQ ("The company has two business segments that reflect its two distinct methods of delivering products to market.").) While FF routinely mentions that the DSD segment "sells its products through a network of independent distributors to retail and foodservice customers," (*see, e.g.*, Ex. A at 2), that FF uses purportedly independent distributors does not mean that FF does not also hold itself out as a distributor of its Products. (*See id.*) FF's "Business Overview" on its "Flowers Foods At-A-Glance" webpage, for example, includes a pie chart for "Distribution," showing that DSD accounts for approximately 85% of FF's distribution-related business. (*See id.*) The website also shows a map of the United States with "Flowers Foods Bakery Locations/Market Territory," which depicts FF's sizeable "fresh (DSD) market distribution." (*See id.* at 2–3.) Exhibit A also includes an "Investor Fact Sheet," which identifies FF's "Business" as a "producer and marketer of packaged bakery foods in the U.S.," and defines its "Market" as "[r]etail and foodservice," with sales of its "[f]resh bakery foods to 85% of

the U.S. population through a network of independent contractors." (*See id.* at 4.) This page includes the same pie charts and map as FF's website. (*See id.*) It goes on to provide detailed information about FF's "OPERATING SEGMENTS," i.e., the DSD and warehouse delivery segments. (*See id.* at 5.)

The other exhibits identified by Defendants, Exhibits B and V, are publicly filed and available SEC filings:  Exhibit B is FF's Form 10-Q quarterly report for the period ending April 21, 2018, (*see generally* Ex. B), and Exhibit V is FF's Form 10-K annual report for the fiscal year ended December 28, 2013. (*See generally* Ex. V.)  In these filings, much as on its website and in its investor materials, FF describes itself as a national "producer and marketer of . . . bakery" products. (*See, e.g.*, Ex. B at 8, 41; Ex. V at 5.)  But also as in Exhibit A, FF advertises that it is more than a bakery.  For example, FF notes that its "business is managed based on delivery method of [its] products and [FF] ha[s] two operating segments," the DSD and Warehouse Delivery segments. (*See* Ex. B at 41; *see also id.* at 8; Ex. QQ at 23 ("The design of our delivery systems and segments permits us to allocate management time and resources to meet marketplace expectations.").)  FF acknowledges the importance of its "relationships with [its] retail and foodservice customers," (*see* Ex. V at 5), which "include mass merchandisers, supermarkets and other retailers, restaurants, quick-serve chains, food wholesalers, institutions, dollar stores, and vending companies." (*See id.* at 7.)  FF also represents that its products are "distribut[ed]" or "sold" "through a DSD . . . system," (*see id.*; Ex. B at 8), and that FF itself personally operates 230 of its territories. (*See* Ex. QQ at 1.)  Further, as a larger operation, FF "enjoy[s] . . . competitive advantages . . . , including greater brand awareness and economies of scale in purchasing, distribution, production, information technology, advertising and marketing." (*See* Ex. V at 9; *see also* Ex. QQ ("Throughout our history, we have devoted significant resources to automate our production facilities and improve our distribution capabilities.  We believe these investments have made us one of the most efficient producers of packaged bakery products in the United States.").)  While it is undisputed that Defendants hold themselves out as a producer and marketer of baked

goods, these filings also demonstrate that Defendants tout their distribution capacity.  (*See* Ex. Q at 4 ("We believe our company also invests wisely and bakes smart by: . . . [i]mproving our shipping and logistics.").)

Finally, Defendants contend that "[e]ven more factual issues are present because Plaintiff contends Flowers Foods, the ultimate parent, does not meet prong B.  Flowers Foods provides overall direction to its subsidiaries and is not a party to the DA.  How Flowers Foods' business is allegedly aligned with Plaintiff's is replete with factual issues." (*See* Opp'n at 13–14.)  The Ninth Circuit has recognized, however, that, "as a doctrinal matter, [FF] could be [Mr. Russell's] employer under the ABC test even though it is not a party to any contract with [Mr. Russell]."  *See Vazquez*, 986 F.3d at 1124.  This is because "[w]here a party is the agent of misclassification, it may be directly liable under [the ABC test], even where it utilizes a proxy to make arrangements with its employees." *Id.* (quoting *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 624 n.17 (2013)).  Therefore, "[a]s long as the putative employee was providing a service to the hiring entity even *indirectly*, the hiring entity can fail the ABC test and be treated as an employer." *Id.* (emphasis in original) (citing *Depianti*, 465 Mass. at 623–24).

Here, although Mr. Russell signed his DA with FBC California, (*see* Parmer Decl. ¶ 8; Ex. L), FF is the entity that owns the delivery routes, (*see, e.g.*, Ex. V at 7 ("The company has sold the majority of these territories to independent distributors under long-term financing arrangements."); *see also* Ex. QQ at 6, 49, F-9, F-16); finances the purchases and holds the distribution rights notes receivable, (*see* Ex. Q at 49, F-8–F-9, F-16); recognizes sales and administrative expenses related to its DSD segment, (*see id.* at 30–31, F-54); and negotiates contracts with retailers, particularly the big brands that make up the vast majority of FF's business that the Distributors then fulfill.  (*See id.* at 5, 10.)  Under these undisputed facts, the Distributors have provided a service to FF and, consequently, FF may be held directly liable for their misclassification despite the Distributors' interactions with FF's intermediaries. *See Vazquez*, 986 F.3d at 1124.

/ / /

The Court therefore concludes that Defendants have failed to meet their burden of identifying genuinely disputed material facts demonstrating that their Distributors perform work that is "outside the usual course of [Defendants'] business." Accordingly, the Court **GRANTS** Mr. Russell's Motion and **DISMISSES** Defendants' first affirmative defense.

## IV. Motion to Seal

At Defendants' insistence, (*see* Mot. to Seal at 2; ECF No. 172-2 ("Markley Decl.") ¶¶ 26–27), Mr. Russell moves to file under seal twenty-two documents produced by Defendants (Exs. D, F, H–O, T, W–EE, JJ, NN), and those portions of his Memorandum referencing those documents. (Mot. to Seal at 3–5; Markley Decl. ¶¶ 2–23, 25.) All told, these documents comprise over 400 pages. (*See generally* ECF No. 173.) Mr. Russell explains that the Exhibits they move to file under seal were all designated "CONFIDENTIAL" by Defendants pursuant to the then-operative Protective Order entered in this action, ECF No. 19. (*See* Mot. to Seal at 2; *see also* Markley Decl. ¶ 24.) Defendants have provided no further legal authority for these documents to be filed under seal. (*See* Mot. to Seal at 2; Markley Decl. ¶¶ 24, 26–27; *see also generally* Docket.)

As the Court has previously informed the Parties, (*see* ECF No. 187), a party seeking to seal a judicial record bears the burden of overcoming the strong presumption of access. *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). "[T]he presumption of access is not rebutted where documents which are the subject of a protective order are filed with the court as attachments to summary judgment motions' and . . . 'to retain any protected status for documents attached to a summary judgment motion, the proponent must meet the compelling reasons standard and not the lesser good cause determination." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1177 (9th Cir. 2006) (internal quotation marks omitted) (quoting *Foltz*, 331 F.3d at 1135). Through no fault of his own, Mr. Russell cites only to the Protective Order as justification for sealing the documents filed in support of his Motion for Partial Summary Judgment, which is insufficient under Ninth Circuit precedent. The Court therefore **DENIES WITHOUT PREJUDICE** Mr. Russell's Motion to Seal (ECF No. 172).

1

**CONCLUSION**

2    In light of the foregoing, the Court **GRANTS** Mr. Russell's Motion for

3  Partial Summary Judgment (ECF No. 171) and **DISMISSES** Defendants' first and

4  thirty-second affirmative defenses as to Mr. Russell.    The Court also **DENIES**

5  **WITHOUT PREJUDICE** Mr. Russell's Motion to Seal (ECF No. 172).    Defendants

6  **MAY FILE** a renewed motion to file under seal any documents for which

7  "compelling reasons" exist within fourteen (14) days of the electronic docketing of this

8  Order.    Should Defendants elect not to file a renewed motion, Mr. Russell **SHALL**

9  **FILE PUBLICLY** ECF No. 173 in its entirety within twenty-one (21) days of the

10  electronic docketing of this Order.    **IT IS SO ORDERED.**

11

12  Dated:  September 20, 2021

13

14  Honorable Todd W. Robinson
    United States District Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28